Filed 8/24/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>KA YANG,<br><br>      Defendant and Appellant. | C080978<br><br>(Super. Ct. No. 11F04310)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Respondent filed a petition for rehearing with this court. It is hereby ordered that the petition for rehearing is denied.

1

It is also ordered that the opinion filed herein on July 28, 2021, be modified as follows:

1.     In the editorial portion of the published opinion, Deputy Attorney General Julia A. Hoskans should be listed as "Julie A. Hokans."

2.     On page 4 under the heading *Defendant's Seizures*, the first sentence will be modified after the word "experienced" and the entire sentence will now read as follows:

"Defendant began having seizures at age 13 or 14 and by the time of the killing had experienced at least 100 and possibly as many as 1000 seizures in her lifetime."

3.     On page 66 in the first paragraph (the sentence is a continuation from page 65), the word "primarily" is to be inserted in the third line of sentence before the words "on his opinion." That sentence in its entirety will now read:

"Moreover, while Dr. Treiman opined at trial that the time between defendant's last act on her computer and the time she found her mother was insufficient for her to have had a seizure, perform the acts required to kill her daughter, and fully recover by the time Va returned home from picking up defendant's sons from school, his conclusion was based primarily on his opinion that defendant only suffered from generalized onset seizures, an opinion with which Dr. Garcia disagreed."

4.     On page 68, following the conclusion of the first full paragraph after the words "defendant was suffering from mental illness," a footnote is to be inserted as follows:

"[29] In his petition for rehearing, the Attorney General argues the "key fact" of defendant's "recurring thoughts of suicide" also signaled a mental disorder, citing a website listing suicidal ideation as one of eight diagnostic criteria for clinical depression. First, the Attorney General overstates the relevance of the admissible evidence of suicidal ideation, which we have set forth in detail elsewhere in this opinion and decline to detail here. Second, the article offered by the Attorney General states the following qualification *prior* to the listing of the eight symptoms: "The DSM-5 outlines the following criterion to make a diagnosis of depression. The individual must be experiencing five or more symptoms during the same 2-week period and at least one of the symptoms should be either (1) depressed mood or (2) loss of interest or pleasure." (Truschel, *Depression Definition and DSM-5 Diagnostic Criteria* (Sep. 25, 2020) PSYCOM <https://www.psycom.net/depression-definition-dsm-5-diagnostic-criteria/> (as of Aug. 20, 2021), archived at <https://perma.cc/46S7-D3AT>.) There was no evidence presented that defendant in any way met this requirement."

5. The remaining footnotes should be renumbered due to the addition of footnote 29.

This modification does not change the judgment.


FOR THE COURT:


_____/s/_____
Duarte, Acting P. J.


_____/s/_____
Hoch, J.


_____/s/_____
Renner, J.

Filed 7/28/21 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C080978 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F04310) |
| v. | |
| KA YANG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steve W. White, Judge. Reversed.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julia A. Hoskans, Clara M. Levers, Deputy Attorney General, for Plaintiff and Respondent.

1

This is an excruciatingly tragic case.

A mother of four young children was found guilty by jury of first degree murder and assault on a child resulting in death, after she killed her youngest child and only daughter. There was no dispute that on an otherwise routine afternoon, defendant Ka Yang, while alone with her baby Mirabelle, placed the baby in a microwave oven and operated it for multiple minutes. These actions killed the baby, whom by all accounts was a child Yang cherished.

Defendant told her family and first responders that she did not know how the baby was injured, but she consistently spoke of having suffered a seizure, and guessed that the baby had been injured when dropped on a nearby heater while defendant was incapacitated. Defendant had a history of epilepsy; her defense at trial, supported in part by expert testimony, was that she killed her daughter while unconscious due to an epileptic seizure.

The prosecution countered defendant's claim of unconsciousness with expert testimony of its own, including testimony regarding postpartum mental disorders and testimony utilizing defendant's privileged psychological records, after an inadvertent disclosure by the trial court allowed the prosecutor to discern these records' contents midtrial and secure their admission on that basis. Although defendant had not been diagnosed with any postpartum mental disorder, and Mirabelle's pediatrician testified defendant had screened negative for any such disorder, the prosecution relied on this evidence to theorize that defendant was motivated to kill her daughter by hallucinations related to undiagnosed postpartum psychosis.

We conclude the trial court abused its discretion by allowing expert testimony regarding postpartum mental disorders without sufficient factual basis and by subsequently admitting into evidence defendant's psychological records not directly related to any mental condition she had put at issue. Because we cannot conclude these

errors were harmless when considered together, we reverse the judgment in its entirety. Accordingly, we do not reach defendant's remaining claims.[1]

## FACTS AND PROCEEDINGS

In September 2015, an amended information charged defendant with the first degree murder of her infant daughter, Mirabelle (Pen. Code, § 187, subd. (a); count one), and assault on a child resulting in death (*id.*, § 273ab; count two). It was further alleged defendant personally used a deadly and dangerous weapon, to wit, a microwave, in the commission of the murder as charged in count one. (*Id.*, § 12022, subd. (b)(1).) The murder was alleged to have occurred on March 17, 2011; defendant first appeared on the charges on June 23, 2011. The case proceeded to trial on August 31, 2015, and defendant was sentenced on December 18, 2015. This timely appeal followed.[2]

Numerous witnesses testified during trial, including defendant's family members and former coworkers, emergency personnel who responded to the scene, law enforcement officers who interviewed defendant, and expert witnesses who testified about epilepsy, causes of infanticide, postpartum mental disorders, and microwave ovens. We categorize and summarize the relevant testimony here, and add any additional details as necessary to clarify the nature of procedural disputes and the issues on appeal later in our Discussion.

---

[1] Defendant's additional claims on appeal include instructional error, improper removal of a juror, and charging error.

[2] The notice of appeal in this case was filed on December 29, 2015. Due to many delays in preparation and transmittal of the record and multiple augmented records, as well as multiple extensions to the briefing schedule, this case was not fully briefed and assigned to this panel until August 2020. This panel ordered supplemental briefing in December 2020, which was complete in February 2021. The case was argued and submitted in May 2021.

*Defendant's Background*

Defendant, who was 29 years old at the time of the killing, was born in the United States and is of Hmong descent.  She lived in Sacramento with her husband, Chi Lo, their three young sons, then aged four, seven, and eight, and their daughter Mirabelle, who was born on January 22, 2011.  Defendant loved her children and took good care of them.  She was very happy to have a daughter, and by the family's account she loved and cherished Mirabelle.

Chi's brother, Va Lo, also lived with the family, and defendant's mother, Choua Kue Yang,[3] stayed with them periodically.  Defendant's relatives lived nearby and helped when needed.

Defendant worked as an office worker while pregnant with Mirabelle, and after Mirabelle's birth she worked at home preparing checks over the Internet for a few hours a day.  Chi was a long-haul truck driver; typically he was on the road during the week and at home on weekends, but at times he would be gone for up to 14 days at a time.

*Defendant's Seizures*

Defendant began having seizures at age 13 or 14 and by the time of the killing had experienced more than 100 seizures in her lifetime.  She took medication to control her seizures, but she did not believe the medication helped.  According to defendant, during her seizures she lost consciousness, fell down, and afterward did not remember what happened.

Defendant's husband Chi had witnessed many of her seizures.  In his experience, defendant described seizures as beginning with a "flash" or "flashback."  She did not know when she was going to have a seizure and had no memory of what happened during her seizures.  She would fall from a standing or seated position, her hands would curl up,

---

[3] Due to the similarities of surnames between defendant and other witnesses, we refer to defendant's family members by their first names.

4

her body and extremities would shake, her eyes would roll into her head, and she would drool while making moaning or groaning noises. She bit her tongue 90 percent of the time and sometimes lost bladder control. In Chi's experience, defendant did not walk around or do anything during her seizures, which lasted for at least two to five minutes. After a seizure she had very low energy, was slow to get up, and seemed dazed and confused. Normally she would go somewhere and lie down, and it would take three to four hours to regain her senses.

Defendant's mother Choua testified some of defendant's seizures were more intense than others.[4] When she had a "fall-down" seizure, she would fall to the ground and shake, clench both fists and bite her tongue. These could last up to 10 minutes. When she came to, she would get up after taking a moment, the amount of time varied. Choua would help her to her room, and she was back to normal after sleeping for 30 to 60 minutes.

Other witnesses to defendant's seizures noted that defendant often appeared weak, confused, disoriented, or exhausted after a seizure. During that time, she could not follow simple commands and she could not have completed any complicated task such as working on a computer or driving. She would gradually regain consciousness; her recovery time appeared to depend on the severity of the seizure. Three witnesses who had observed defendant's seizures testified defendant sometimes tried to sit up or get up soon after suffering a seizure, but those who witnessed the seizure would tell her to stay down. One witness testified paramedics arrived "probably four or five minutes" after defendant had a seizure on the occasion the witness observed; defendant was able to answer their questions but did not understand why the paramedics were there.

Defendant's sister-in-law testified defendant's seizures were not always the same. She observed defendant have two seizures that caused her to fall to the ground, clench her

---

[4] Choua testified with the assistance of an interpreter.

fists, and shake for two to three minutes.  But she also observed one instance in which defendant was sitting on her couch when her face went blank, and she looked dazed for about a minute.  When she regained her senses, she did not remember what they were talking about.

Defendant's brother, Kao Yang, also testified defendant's seizures varied widely.  Sometimes her seizures would cause her to fall down and shake, but sometimes she would "just kind of blank out for several minutes."  During those "fast seizure[s]," she would stiffen up and shake, but not fall, due to how she was positioned on a bed or couch.  She would usually get up a minute or so, or up to five or 10 minutes, after the seizure was over, but sometimes Kao would tell her to sit down because she was "woozy" as she walked, "like, she's not there."  Other times she would get up and "you can't really tell."  She would not perform any automatic acts.  Sometimes she would stay on the couch, and sometimes she would walk into a bedroom.  It generally took some time before defendant was conscious and alert again.  In neither instance would defendant remember what had happened.

Defendant was involved in two car crashes due to her seizures, the most recent of which occurred only a week before Mirabelle's death.  She recalled having a "flashback" while driving, before awakening in the hospital.  She described the flashback as:  "Um, I had like, you know, you see a person right in front of you."  She could not describe the person.

*Mirabelle's Death*

March 17, 2011, began normally.  Chi was out of town working.  Choua arrived late the previous evening to help defendant care for Mirabelle, because defendant needed time to apply for public benefits that afternoon.  Defendant fed Mirabelle at

6

approximately 5:00 a.m.[5]  Defendant accessed a check on the Internet for her job at 6:00 a.m.  She and Mirabelle got out of bed at approximately 7:00 to 7:30 a.m., and she changed Mirabelle's diaper because the baby was crying.  Defendant brought Mirabelle to Choua so she could run an errand.  When she returned home, defendant yelled at the boys to quit playing video games and get ready for school.

Choua walked the two older boys to school and worked in the yard upon returning home.  Defendant prepared food for her youngest son.  Choua came inside at 10:00 a.m. and changed Mirabelle's diaper.  Defendant's youngest son played with Mirabelle, who was lying on a pillow on the floor, and defendant yelled at him for playing too roughly with the baby.  She told him to take a shower.

Defendant began working on her computer.  She checked on her youngest son and yelled at him for spilling water after his shower.  Her son began playing with Mirabelle again, and she told him to get dressed for school.  Choua put Mirabelle in her bouncy chair and cooked breakfast.  Defendant continued to work on the computer.  Mirabelle started to cry, so defendant gave her a bottle, as Mirabelle was a bottle-fed baby.  Mirabelle continued to cry, so defendant gave her a pacifier, and Mirabelle slept for a few minutes.  Mirabelle was crying more than normal that morning.  Choua testified Mirabelle was a little fussy, but it did not concern her.  Chi (who spoke with his wife every day) testified defendant did not ever say she was stressed, overworked, or frustrated; he called her from the road the morning of the killing during a break and spoke with her for at least an hour, possibly two, which was not unusual.  She did not mention that the baby was crying or otherwise acting strangely; they spoke of routine matters, and nothing seemed out of the ordinary.  They ended their call at some point before noon.

---

[5]  The precise order and timing of the morning's events before the actions directly leading to Mirabelle's death differed slightly between accounts.  We synthesize the various accounts here; any discrepancies do not affect our analysis.

Mirabelle began crying again as defendant and Choua ate. Choua picked her up. Va walked defendant's youngest son to school at approximately 11:55 a.m.; he returned at approximately 12:15 p.m. and went to his room. After they finished eating, defendant put Mirabelle back in her bouncy chair and made her another bottle. Choua resumed her work in the yard. Va, who testified that Mirabelle generally "wasn't a quiet baby" and "had times when she cried," heard "normal crying" from Mirabelle between 1:00 and 1:30 p.m. He clarified that she cried for "a minute or two" at that time, which was not unusual.

Va left the house at approximately 1:55 p.m. to pick up defendant's two older sons from school. He saw defendant working at the computer as he left; he did not see or hear Mirabelle. Computer records showed that defendant worked on multiple checks between 1:10 p.m. and 1:58:34 p.m. After Va left at approximately 1:55 p.m., defendant was alone inside the house with Mirabelle while Choua worked in the yard outside.

Defendant was interviewed multiple times by law enforcement after the baby's death and provided them with information about what happened while she was alone with the baby; these interviews were presented as evidence against her at her trial. She told the detectives she gave Mirabelle the bottle again and then the pacifier. She noticed Mirabelle's eyes were moving back and forth like she was looking at a fly, but there was nothing there. She said the eye movement without apparent cause "kinda scared me a little bit," but she did not think anything would happen because of her faith in God. The family were practicing Mormons. Mirabelle rejected her pacifier and was crying, so defendant picked her up and held her, and she stopped crying.

Defendant's head started pounding, followed by a flash of white light or "flashback." She woke up with Mirabelle lying next to her in the bedroom or in the front room. She believed she had a seizure because she wet herself and bit her tongue. She did not remember anything that had happened during the seizure. She noticed Mirabelle was red in the face, was stiff, and was not breathing. Crying, defendant brought Mirabelle to

8

Choua, whom she thought was in the kitchen. When asked why she did not look for Va instead, defendant confirmed that although she did not remember him leaving that day, she remembered him returning to the house after she had found Choua, and she knew Va had been away because he "always leaves to go pick up" her older sons. After she awoke from the seizure, she "was scared" and "just went to find [her] mom because that's how . . . [she] reacted."

At that time Choua was returning to the house from the yard. She testified that when she reached the stoop, defendant opened the door holding Mirabelle, who wore pajamas and was wrapped in a blanket. Defendant said Mirabelle was sick, and they needed to take her to the hospital.

Choua saw that defendant's face was flush, her body was sweaty, her pants were wet around her thighs, and her tongue was bitten so she could not speak clearly. Choua unzipped Mirabelle's pajamas, and she saw Mirabelle had burn marks on her chest, her skin was peeling off her chest, and her body was hot to the touch. Defendant started to peel off Mirabelle's skin near the top of the closure of her pajamas, but Choua slapped her hand away.

When Va returned to the house from picking up the boys from school, the front door was open and defendant and Choua were standing five feet inside the house. Choua was holding Mirabelle; defendant said something bad happened to the baby, and Choua said defendant might have had a seizure. Defendant and Va discussed taking Mirabelle to the hospital. Choua told him to call 911, which he did at 2:09 p.m., or approximately one to five minutes after he arrived back at the house.

On the 911 call, which was played for the jury, Va repeated what Choua had told him: that defendant had a seizure and dropped the baby and probably fell on her. During the call, defendant complied with Va's instructions from the dispatcher to put Mirabelle on the sofa and to perform mouth-to-mouth. Defendant later told detectives she performed chest compressions on Mirabelle, and Va initially testified to the same. But

9

after hearing the recorded 911 call and discussing the statement he gave in 2011, Va testified that he performed the chest compressions rather than defendant. Va could not recall whether defendant appeared disoriented, but she answered his questions. Nothing suggested to Va that defendant was recovering from a seizure, although he thought a seizure was the most likely explanation because defendant was a good mother who loved her children and would never harm them on purpose.

*First Responders*

First responders arrived at 2:16 p.m. Brandon Gaub, a firefighter and paramedic, entered the house at 2:17 p.m. and saw defendant kneeling next to Mirabelle on the couch. He asked defendant to move out of the way, and she complied. Gaub asked what happened to Mirabelle, and someone in the room responded: "I don't know." Someone said defendant had a seizure and mentioned falling on a space heater. He did not formally assess defendant, but nothing he observed from his limited interaction with her suggested that she had suffered a seizure.

Firefighter and emergency medical technician Jennifer Ertl testified defendant said she had a seizure while working on the computer, and she dropped Mirabelle onto a heater. When pressed, defendant repeated her explanation. Defendant then said she did not know what happened. A man told Ertl that defendant had a seizure and fell against the heater. Officer Bohrer later interviewed Ertl at the scene, and she said defendant told her over and over that she had a seizure and did not know what happened. Defendant was calm, alert, standing, talking, and making eye contact. She did not appear to Ertl to be confused or disoriented.

Gaub and Ertl acknowledged they breached protocol for treating a person who reported experiencing a seizure by failing to assess defendant's medical condition, prepare a patient care report for her, or offer to transport her to the hospital.

Police officers arrived at 2:23 p.m., at which time Mirabelle was pronounced dead. Officer Shippen interviewed defendant at 2:25 p.m. Defendant told Shippen what she did

10

that day before her seizure, that she had a history of seizures, that she believed she had a seizure at approximately 1:30 p.m., but that she could not remember what happened. She did not appear disoriented and appeared to understand and appropriately respond to his questions. She appeared "fairly calm" and did not appear weak; he testified that it was possible her calm demeanor was due to shock. He did not check her clothing for incontinence, but he did not smell urine.

A detective found a pacifier in the microwave oven.

*Investigation and Forensic Testimony*

Mirabelle died of thermal injuries resulting from overexposure to microwave radiation in a microwave oven. She had second and third degree burns on approximately 56 percent of her body and suffered severe internal burns. The burn patterns were consistent with burns from a microwave oven and suggested that defendant placed Mirabelle in the oven lengthwise and on her back.

A microwave oven expert estimated Mirabelle was in the oven for over two to three minutes at a minimum, and although an exact estimate was impossible, his best estimate was at least five minutes. It would take two to three minutes in the microwave oven to cause the injuries that killed Mirabelle, but the resulting burns would have taken longer.

The expert witness demonstrated how to use defendant's microwave. To cook for five minutes, the user must press the buttons "five-zero-zero and then start" in order. Nothing happens if only the "start" button is pressed. Pressing the "five" and then "start" buttons causes the oven to cook for five seconds. Pressing the button "add a minute" once cooks for one minute, and each additional impression adds another minute to the cook time. Pressing the "baked potato" button twice and then pressing the "start" button would cause the microwave to cook for five minutes.

*Defendant's Law Enforcement Interviews*

Detective Thomas Shrum interviewed defendant later on the date of the killing, the recording of which was played for the jury. Defendant stated she had no memory of what happened because her seizures cause her to fall down and not remember events. Defendant believed she had a seizure because she bit her tongue, wet herself, and could not remember what happened. Shrum testified that did not see blood or a fresh wound on defendant's tongue, did not smell urine, and did not notice that defendant's pants were wet.

Defendant denied she had burned the baby using the stove or the microwave, but she also responded that she did not know when Shrum posited that she put Mirabelle in the microwave when she had a seizure, adding that when she had a seizures she could not remember what had happened. She later agreed with Shrum that she could not have had a seizure because she would have fallen down. Defendant told Shrum she had never hurt herself or anyone else during a seizure; she had only walked from one place to another without remembering how. She repeatedly denied that she was stressed, frustrated, or angry at Mirabelle for crying. At the close of this interview, where at times defendant responded to questions in what seemed a confused manner, detectives told her she should go see a doctor. She responded that she would, but she had trouble responding to their questions as to where she would go, telling them instead that: "It's after my seizure, my brain just keep [*sic*] hurting. For a couple hours before it, um, before it gets back to normal."

Detectives later interviewed defendant and Choua together. When asked why defendant killed Mirabelle, mother and daughter mentioned "spirits," and later clarified that "spirits" referenced "possession" by her seizure, not that "spirits made her do it."

On March 18, Detectives Brian Dedonder and Shrum interviewed defendant; excerpts were played for the jury. Defendant said she picked up Mirabelle and gave her a pacifier at approximately 1:00 p.m. She experienced a "flashback" and had a seizure a

12

few seconds later. She did not remember anything that happened until approximately 2:00 p.m. She was with the baby in the bedroom when she awoke; she could smell urine. When defendant noticed Mirabelle's face was injured, she ran from the bedroom into the front room and through the kitchen.

On March 22, Detective Hanspeter Merten interviewed defendant; a redacted recording was played for the jury. Defendant told Merten she generally ends up on the floor after a seizure, and she lies there until she has enough energy to get up. Her family has never told her she does anything unusual after a seizure. Defendant said that Mirabelle did not typically cry much, but she was crying more than normal that morning. She repeatedly denied being frustrated by Mirabelle's crying, but she agreed with Merten that she was "[a] little bit" frustrated because Mirabelle would not fall asleep, and she had work to do.

Defendant told Merten in response to his question as to whether she had ever wanted to "physically hurt someone" that she had thought about hurting herself when she was 14 or 15 years old after she began having seizures. She never thought about hurting anyone else. She had not had those feelings since Mirabelle's birth. Merten asked defendant again if thoughts of killing herself had "gone through your mind here lately like in the last few months[;] I mean, after the - you know, the birth of your daughter or anything where you just become so frustrated?" Defendant responded, "No." Defendant again denied thoughts of harming herself, despite the fact that her seizures continued to occur while she took medicine to treat them. Finally, she acknowledged that thoughts of harming herself were "still there" now, but she did not act on them because of her three boys.[6]

---

[6] It is unclear in this exchange whether defendant was admitting she thought of harming herself before--rather than after--killing Mirabelle, as when she discussed her children, she specified her three boys, and agreed with Merten that they were young and needed their mother.

13

*Additional Statements by Defendant*

On March 18, Chi spoke with defendant at the police station; the conversation was recorded. The conversation was in Hmong and was later translated into English. A translated transcript of the conversation was used by the prosecutor to refresh Chi's recollection of the conversation during his trial testimony, but it was not admitted into evidence. Chi testified that "some of the words we said they translated correctly. Some words was [*sic*] not." He was not asked for specifics.[7] He agreed with the prosecutor (who was reading from the translated transcript) that defendant told him at the police station, "[T]he spirit called me. So I had a seizure," and that she fell on the baby, possibly on the heater. He said defendant did not remember what happened. She said that before the seizure, Mirabelle was moving her eyes back and forth looking at something, was crying, and was spitting out her pacifier. She told him a "spirit and demon together"--he said the term defendant used is difficult to translate into English-- was looking at her through the window; he first testified defendant saw a Caucasian demon or spirit outside staring at her and the baby through the window "at a different time" than when she saw Mirabelle's eyes moving back and forth, but he later agreed with the prosecutor that it was at the same time. Defendant also told him the demon or

---

[7] The parties disagree as to the relevance of the transcript and whether it is properly referenced in this appeal, given that it appears in the appellate record but was not admitted into evidence at trial. After disputing its relevance in earlier briefing, the Attorney General quotes the transcript at length in opposition to defendant's motion to strike portions of the Attorney General's brief. Defendant argues we may consider the transcript because the prosecutor's use to refresh Chi's recollection at trial indicates that the prosecutor treated it as accurate. We agree with the Attorney General that we should only *rely* on those portions of the transcript that were read into evidence; however, we agree with defendant that where reference to the transcript's contents is necessary to counter an apparent mistake or misrepresentation regarding the state of the evidence, we will reference the transcript and note the reference.

spirit was walking around outside of the house and wanted the baby.[8] He agreed defendant did not say the spirit made her do anything, and that she had no history of talking about spirits or demons.

Chi clarified on cross examination that he did not interpret defendant's statements as attempting to place blame for the killing on a "Caucasian." Rather, Chi agreed defendant's discussion of spirits or demons was her attempt to piece together an explanation for what happened. Some people in Hmong culture believe that "epilepsy is the spirit invading the body," or is a manifestation of spiritual or demonic possession, although Chi did not hold that belief and did not think much of it, crudely dismissing it as "BS and horseshit."

Three days before trial, the prosecutor and his investigator interviewed Chi, and excerpts were played for the jury. Chi referenced "demons" when discussing defendant's claim to have had a seizure. He said defendant told him (in Hmong) that there was a good demon at the front of the house and a bad demon at the back of the house. Defendant said the demon made her kill Mirabelle. Chi spoke to defendant again the next day, and she told him again that "a demon made me do this and that." Chi explained in the interview that defendant was "saying she had a seizure and at the point the demon took . . . over her body and made her do what she did."

Choua testified at trial that defendant's references to a spirit or demon were related to things defendant's brother Kao had told her. Defendant told Choua she did not want to repeat what Kao had told her about the house being built on a cemetery, or about a ghost that was watching her and was going to take the kids and take her, for fear of appearing

---

[8] According to the translated transcript of Chi's conversation with defendant, defendant clearly stated that her brother Kao (Kob) had told her that a "Caucasian guy" kept looking at her from outside *before* she was pregnant. The transcript also reflects that defendant told Chi that she had had a *dream* about a Caucasian man. Neither attorney used the transcript to refresh Chi's recollection on this point.

crazy. Choua testified the term "spirit" is used in the Hmong term for "seizure." Choua does not use that term, and she did not teach defendant that spirits are involved with seizures. According to Choua, defendant differentiated between seizures and demons.

Va testified that defendant sat with family members trying to figure out what had happened a day or two after the killing. She said she did not know what happened and that she blacked out while sitting at the computer. Defendant said in the week after the killing that she saw spirits, but she did not specify the day or whether she saw them before the killing, and she did not connect the spirits or demons to the killing in any way. Defendant did not mention Mirabelle's eyes moving.

Kao spoke to defendant before and after Mirabelle's death. Defendant told Kao she had a seizure and did not know what happened. She did not mention anything about spirits or demons, although she did tell him about a dream she had involving "spirits and stuff like that." Defendant did not tell Kao that a spirit or demon made her do anything. Defendant did not mention to Kao that Mirabelle's eyes were moving back and forth on the day of her death, and she did not mention any shadows. Kao testified he did not feel comfortable discussing spirits because he is not an elder, and that is something elders should talk about.

In an April 2011 interview with an employee from child protective services (CPS), defendant again said she was sitting with Mirabelle, "went blank" while working at the computer, and woke up in bed with the baby. The employee testified defendant said that she had seen a black shadow moving around her house, but did not clarify the date and time of the sighting and the employee did not ask any follow up questions. The employee did not ask whether the sighting was before or after the baby's death or any other specifics.[9]

---

[9] In her motion to strike portions of the Attorney General's brief, defendant asserts that the briefing impermissibly infers from this testimony that she "described specific visual hallucinations to . . . the CPS worker and said she experienced them right before

16

*Expert Testimony Regarding Epilepsy*

Seizures are caused by abnormal electrical discharges in the brain and can be caused by head trauma, stroke, brain infection, brain tumors, or genetic causes. They can be partial or generalized. Partial seizures can be simple or complex. A simple partial seizure affects a specific portion of the brain, which may affect a specific body part, such as a shaking hand, but does not cause loss of consciousness. A complex partial seizure spreads to both sides of the brain and involves a partial loss of consciousness, or loss of contact with the environment, where the patient appears to be awake with a blank stare and may exhibit automatic movements. A complex partial seizure will not cause a person to fall to the ground and shake. A person suffering from a complex partial seizure may walk around and perform simple tasks--like smacking their lips or getting undressed-- without being aware of what they are doing, but they cannot perform complex tasks. A complex partial seizure can evolve into a secondary generalized convulsion, where there is a total loss of consciousness. The patient will collapse, stiffen, and jerk, and may bite their tongue, foam at their mouth, and empty their bladder.

A generalized onset seizure, which does not evolve from a partial seizure, results in an immediate loss of consciousness; a generalized tonic-clonic seizure is a type of generalized onset seizure and will cause the patient to stiffen and fall (tonic stiffening) and jerk (clonic). A patient who loses consciousness during such a seizure does not remember what has happened. At trial, experts testifying for the prosecution and defense testified the convulsive portion of a generalized tonic-clonic seizure is typically between one and two minutes (Treiman) or 45 seconds to two minutes (Garcia). Some patients

---

Mirabelle was killed." The Attorney General responds that it is reasonable to infer from the CPS worker's testimony that defendant saw the shadow before she killed Mirabelle because defendant used nearly identical phrasing when speaking to Chi. We disagree. Chi did not testify that defendant mentioned a "shadow," and therefore defendant did not use "nearly identical phrasing." Further, the CPS worker testified that she did not ask defendant when she saw the shadow, and defendant did not say.

17

experience a flash before a seizure. Witnesses often overestimate the duration of a seizure.

A person can have more than one type of seizure as part of their epilepsy, but their epilepsy does not change over time, and a person tends to have the same types of seizures over time. A person who consistently experiences generalized onset seizures is not going to experience partial seizures, which are caused by a different kind of epilepsy. But it is possible, although not common, to suffer from both types. The type of epilepsy a person has is often determined by relying on people who have observed the person's seizures.

After most seizures, the person enters into a recovery period known as the "postictal" stage. If the seizure resulted in a loss of contact with the environment or complete unconsciousness, the person remains comatose or close to comatose while gradually regaining consciousness. The person has more control over their behavior as the postictal stage progresses. People can engage in automatic behavior--or wildly confused behaviors--while in a postictal state without being conscious of it. Some people remain motionless following a seizure, while some are able to get up and start doing things. A person recovering in a postictal state may seem dazed and in a state of confusion; they may seem oriented as to some things but not have all of their senses back. While uncommon, people can get up and walk around, take off their clothes, or even drive a car. A person in the early postictal stages would not be able to do a complex task such as operate a computer program or a microwave oven requiring input of a specific sequence of numbers.

Dr. David Treiman, a neurologist with a subspecialty in epilepsy, testified as a prosecution witness. Based on his review of defendant's medical history, Dr. Treiman concluded defendant's seizures are always generalized onset, resulting in her falling to the ground, exhibiting bilateral extremity movement, and tonic-clonic activity, followed by at least a 10 to 20 or maybe a 30 minute postictal period. He had only seen tongue biting with tonic-clonic seizures, not complex partial seizures. He would not assume that

18

her seizures would change from her typical seizure, and he saw nothing to suggest defendant experienced any other kind of seizure before this incident.

When initially asked by the district attorney's office to evaluate the case, Dr. Treiman had opined that it was possible that defendant had a seizure and was in an unconscious state when she put Mirabelle in the microwave. He advised the district attorney's office: "Should not prosecute for murder. Enough probability exists that [defendant] may have had a seizure." However, Dr. Treiman later "further refined" his opinion based on close attention to the "precise timeline." At trial, he concluded it would not be medically supported to claim that defendant, given her medical history, could have made a complex entry into her computer at 1:58 p.m., had a seizure, put the baby in the microwave in a confused state, punched a series of complex numbers, brought the baby to Choua at 2:09 p.m., asked a coherent question about her baby, and been in a state of full and complete recovery by 2:10 p.m. to 2:12 p.m. such that no one noticed she was in a postictal state. Rather, Dr. Treiman would have expected defendant to still be on the ground five to 10 minutes after the seizure, and she would be experiencing confusion for 20 to 30 minutes after the seizure.

Dr. Paul Garcia, a neurologist, testified for the defense after originally having been hired by the prosecution. Dr. Garcia reviewed defendant's medical records, and he opined that defendant had a history of all three kinds of seizures, but that only the tonic-clonic seizures were reported by people who had witnessed her seizures. Dr. Garcia testified detectives told him they saw an injury to the side of defendant's tongue, and he noted biting the side of the tongue is most commonly associated with a partial seizure that does not become a tonic-clonic seizure. Additionally, Dr. Garcia observed that defendant's medical records included a prior normal electroencephalogram (EEG), and the fact that her medication did not suppress her seizures suggested she suffered from partial seizures.

19

Dr. Garcia discussed partial seizures that have spread into enough brain area that a person "isn't completely cognizant of what is going on around them, and yet they have enough together so that they could still do some automatic things." Following such a seizure, some patients are able to get up and start doing things in a very confused state. The postictal state can vary from person to person and from seizure to seizure for a particular person. Dr. Garcia testified the postictal state for a partial seizure can be as short as one to three minutes. Some people bounce back quickly following a tonic-clonic seizure, but it can take others up to 30 minutes to recover.

Dr. Garcia opined it was possible defendant put Mirabelle in the microwave either during a complex partial seizure or while in a postictal state, and that she seized and recovered within the 10 minutes between Va's departure from the house and Choua's discovery of her and the baby in the doorway. It would not be unusual for a person who has a complex partial seizure to engage in "automatic behaviors or disorganized confused behaviors," and Dr. Garcia testified the act of putting an item in the microwave, hitting random buttons, and removing the item would not be uncommon. Whether a person could operate a microwave depends on the number of buttons that must be pushed; it would be easy to start a microwave operated by a single button, but it would not be possible to program the oven with many buttons in a complicated combination.

Dr. Garcia allowed that it would be remarkably rare for a postictal mother to put her baby in the microwave and activate it; he agreed that "it would be like two comets colliding, just absolutely incredible" because of how rare it would be for those events to coincide. He agreed that he had been given information by law enforcement (when originally contacted by them for his opinion on her claim to have had a seizure) regarding defendant's "social factors," such as her lack of a criminal history, employed status, family support and the like. But he indicated that his opinion of whether an action was possible as a result of a seizure "stems only from watching people have seizures."

20

*Expert Testimony Regarding Postpartum Mental Disorders*

Dr. Angela Vickers testified for the prosecution (over defendant's objection, as we discuss in detail *post*) about postpartum mental disorders. Dr. Vickers, who specializes in child abuse and neglect, was Mirabelle's pediatrician. She had received special training in child abuse, child neglect, and postpartum mental disorders. She kept up to date on the medical literature relating to postpartum depression, and she screened mothers in the hospital during well baby visits. She was the medical director of the Child Abuse Program for Sacramento County, which evaluated suspected cases of child abuse and neglect. In that role she trained other pediatricians on how to screen new mothers who are at risk for developing postpartum depression as a means of preventing child neglect and abuse.

Dr. Vickers had no special training in psychiatry or psychology and was admittedly not qualified to render an opinion as to whether someone suffers from postpartum depression or psychosis. She had never testified as an expert regarding postpartum mental disorders.

Dr. Vickers testified that a few days after Mirabelle was born, defendant screened negative for postpartum mental disorders. She did not believe defendant exhibited signs of postpartum depression during Mirabelle's examination, although she did not and could not opine as to whether defendant had *ever* suffered from a postpartum mental disorder. She testified postpartum depression is an underdiagnosed obstetric complication in the United States. Many mothers are reluctant to admit to symptoms of postpartum depression or are unable to identify their feelings. There is no way to ensure a mother tells her doctor about symptoms. Dr. Vickers cited one study in which 80 percent of mothers failed to report their postpartum symptoms, and another in which only 32 percent out of 78 patients with postpartum depression believed they suffered from the disorder.

Dr. Vickers testified that there are three types of postpartum mental disorders: postpartum blues, postpartum depression, and postpartum psychosis. After delivery, 40

21

to 60 percent--up to 80 percent in some studies--of mothers suffer from postpartum blues, or a temporary feeling of sadness that lasts for a few weeks and goes away after four to five weeks. The cause of this condition is unknown, but it could be related to a combination of sleep deprivation and hormonal changes.

Depression-like symptoms persisting for a few weeks are consistent with postpartum depression. Postpartum depression meets specific diagnostic criteria and presents in the first year of a child's life. Symptoms of postpartum depression include difficulty sleeping, changes in appetite, anger, agitation, inability to concentrate, periods of crying with no explanation, and disruptions of daily life. The causes of postpartum depression are unknown, but they may relate to hormonal changes or genetic predisposition to depression.

Several stressors have been identified as risk factors for developing postpartum depression, including a history of depression, current symptoms of depression, the youth of the mother, stress, immigration status, unplanned or unwanted pregnancy, death of a parent, marital discord, domestic violence, unemployment, lack of social or financial support, single motherhood, complications of pregnancy, sick leave during pregnancy, a colicky baby (defined as a baby who cries unconsolably and persistently for hours, rather than a baby who is fussy or who cries intermittently), not breastfeeding, and the mother's introverted personality. More than one risk factor is usually required for postpartum depression, but the exact number of risk factors required to develop postpartum depression is unknown.

Dr. Vickers agreed on cross-examination that--as was defendant's situation--if a mother were not a teenager, had family support, was already a mother of three, planned her pregnancy, was not impoverished, had no recent deaths in her family, had no reports from family that she appeared depressed or overwhelmed, and had no history of marital discord, domestic violence, depression or mental illness, it would be less likely she suffered from a postpartum mental disorder. She recognized that defendant's status as an

22

immigrant was "probably not" a stressor because she is a United States citizen, born here, and speaks English, but she stated there are many factors related to immigration that can cause stress in a family. Dr. Vickers also agreed that a mother's choice to not breastfeed is personal, and the seizure medication defendant took could factor into that decision. She agreed the risk of an inconsolable baby is minimized where the mother has support in the home, as defendant did in this case.

Postpartum depression increases the risk of injury to the baby, and screening for postpartum depression is intended to reduce the risk of child abuse or neglect. Mothers who are not depressed may abuse their babies, but a mother with postpartum depression may be less likely to tolerate the stress caused by a baby crying inconsolably.

Postpartum psychosis is very rare, very serious, and results from the progression of postpartum depression; it does not appear one day and disappear the next. Symptoms of postpartum psychosis include auditory hallucinations, visual hallucinations, disorientation, paranoia, thoughts of harming the child, not knowing who or where she is, rapid mood changes, irritability, psychomotor agitation, severe insomnia, and profound symptoms of mental illness. Postpartum psychosis occurs within the first year of the child's life, but commonly presents within the first two weeks after birth. Dr. Vickers had no information to suggest that defendant had any of the risk factors for psychosis.

An infant faces significant risk of injury or death if her mother suffers from postpartum psychosis because a psychotic mother may intentionally try to harm the child. A mother with postpartum mental disorders is not necessarily going to kill her child; it is rare for a mother with postpartum depression to kill her child and more common for a mother with postpartum psychosis to do so. Although mothers without any postpartum disorders may also kill their children, 41 percent of women who suffered from mental illness thought of harming their child, compared to only seven percent of mothers with no mental illness.

23

Dr. Vickers agreed that a hypothetical person believing there were a Caucasian spirit or demon looking into the window would be experiencing a hallucination or a delusion, but she testified a hypothetical eight-week-old baby could track something around the room with her eyes. She agreed, however, that the perception of a baby tracking her eyes around the room *could* be a maternal delusion resulting from postpartum psychosis.

*Defense Neurology Expert Evidence*

Dr. Phillip Resnick, a physician specializing in psychiatry, testified for the defense.[10] Dr. Resnick testified his research identified five reasons why a mother would kill her child: (1) an unwanted child; (2) revenge against the spouse; (3) overzealous discipline; (4) altruism (saving a child from a fate worse than death); and (5) acute psychotic or postictal state without comprehensible motive.

Dr. Resnick interviewed defendant and her family members, and he reviewed the police reports and defendant's medical records. He testified there was no evidence that defendant killed Mirabelle because she was an unwanted child, to take revenge against Chi, due to overzealous discipline, or as misplaced altruism.

Dr. Resnick testified that defendant's medical records and interviews with her family did not suggest she had experienced symptoms of depression before the killing. She denied auditory and visual hallucinations to the police and in his interview with her. He observed she had never experienced any delusional beliefs, experienced any hallucinations, or had any history of mental illness. Dr. Resnick acknowledged defendant experienced suicidal ideation as a teenager when she first began suffering from seizures,

---

**10** As we discuss *post*, Dr. Resnick was called by the defense out of order (during the prosecution's case) due to a scheduling issue, and was added as a defense witness only after the trial court ruled over defendant's objection that Dr. Vickers would be permitted to testify for the prosecution as an expert witness on postpartum mental disorders as motive evidence.

but he did not consider that significant. Accordingly, he opined there was no evidence defendant suffered from postpartum depression, postpartum psychosis--the symptoms of which are extreme and would have been obvious to anyone around her--or any other mental illness before Mirabelle's death. He further observed any symptoms of depression defendant exhibited *after* Mirabelle's death were not evidence of depression at the time of death; depression is expected after losing a child, being accused of killing the child, and being incarcerated.

Dr. Resnick was not an expert in the area of epilepsy, but he had training in neurology and the effect epilepsy can have on a person. He had studied epilepsy in connection with cases of child killings. Dr. Resnick could not "rule in" a seizure as the cause of Mirabelle's death, but he could not rule it out. Accordingly, he opined defendant most likely killed Mirabelle while in a postictal state following a seizure. He testified that people are able to engage in over-learned behavior, like using a microwave, while in this state. He characterized the inconsistent statements given by defendant regarding the cause of Mirabelle's injuries as probable speculation, "trying to make sense out of a confused period."

The trial court earlier ruled defendant's psychological records were privileged and declined to disclose them to the prosecution. But the prosecutor announced that same morning, immediately prior to Dr. Resnick's testimony, that he received and reviewed a portion of those records the previous day. During the morning recess, taken prior to Dr. Resnick's cross-examination, the prosecutor sought permission from the court to "go into psych records that I do have." The court gave its permission, and, at the noon recess (after which the cross-examination of Dr. Resnick continued), it also ordered disclosure to the prosecutor of any remaining records referencing "psychiatric issues or psychological issues" not already inadvertently disclosed. We discuss this series of events in greater detail in the Discussion section of our opinion, *post*, as it is the subject of one of the claims of error on which we focus.

25

On cross-examination Dr. Resnick testified that he had not received any of defendant's psychological records in advance of trial, although he had asked for them, and he acknowledged he would want to know if defendant had suffered from auditory hallucinations before testifying that defendant experienced no symptoms of psychosis. He acknowledged that during the recess that had just concluded, he received several pages of records "from the jail after the event." The prosecutor asked him about a notation that defendant reported "auditory perceptual experiences," and he denied the prosecutor's assertion that this was a report of hallucinations; rather, the term could signal how "during an aura of an epileptic seizure, people can see and hear things." He noted there was no diagnosis of psychosis, and defendant's classification per the records as "adjustment disorder with depressive mood" was "what happens when people are put in jail after losing a child. They get depressed because it is a tough adjustment." The records also noted defendant had described "a return of auditory hallucinations," and had stated after having a seizure in custody that she "hoped she would never wake up."

After the prosecutor received the remainder of the psychiatric records over the noon recess, he questioned Dr. Resnick at length about psychiatric disorders and statistics related to the correlation between psychiatric disorders and infanticide. Dr. Resnick testified that the mere presence of hallucinations does not render the sufferer psychotic, indicating that 10 to 15 percent of the population experiences hallucinations. He was asked about studies of depressed women as it related to thoughts of harming their children and about colic; he testified 70 percent of mothers with colicky infants experience explicit aggressive thoughts toward their infants, and 26 percent of them had infanticidal thoughts during the colicky episode. However, he added that there was no evidence that Mirabelle was a colicky baby, which is defined as a baby who cries for more than three hours after being changed, comforted, and fed, and which continues for weeks or months.

When asked about undiagnosed postpartum psychosis, Dr. Resnick emphasized that postpartum psychosis "is really quite dramatic" and is "not something that goes unnoticed"; those who suffer from that affliction "are very very sick." He added that transcripts of defendant interviewing with detectives show "no evidence of postpartum psychosis," and confirmed that seeing her baby's eyes moving back and forth and possibly seeing a man looking through the window would not be examples of paranoia, which is a "delusional belief that one is being conspired against and someone wishes them harm."

After verifying that Dr. Resnick had not seen the newly disclosed psychological records before the noon recess, the prosecutor questioned him with jail records indicating that, in August 2011, defendant reported experiencing auditory hallucinations after Mirabelle's birth. The prosecutor read into record Exhibit 134, which indicated defendant said: "There were voices that were talking in her head, and she would try and cope with them by trying to push them out and not pay attention to them, and which she said was successful, at times. [¶] Other times she reports it was like someone was coming up behind her. She said that she had told her husband this and a priest that had come to the house after the death of their daughter. She said they told her it was only in her head and not to pay attention to it. [¶] During this period after the daughter's birth, she said she was not eating as much, had an increase in [auditory hallucinations], an increase in seizures, but did not feel very depressed. [¶] She said after her daughter's death, the [auditory hallucinations] and seizures decreased, and she felt more depressed. [¶] She said that she did not tell others about her experience with [auditory hallucinations] because of fears of being told she was 'crazy.' " The same note stated: "[Defendant] describes psychotic-like [symptoms] that occurred following birth of her daughter. Reports these have gone away at this time. Still some slight depression, but reports improvement in this area also."

A psychiatric service note from September 2011 stated that defendant "reported at that time she had a report of experiencing auditory hallucinations prior to coming into custody." The note continued, "she does report one episode of her experiencing the auditory hallucinations she had prior to coming into custody, saying the voice had told her, I'm back again, but no other interaction." A note from December 2011 read in part, "[s]he told jail psychiatric services that about one week after she had given birth to Mirabelle, she began to hear some auditory hallucinations."

Dr. Resnick testified that this new information was important. He again clarified that auditory hallucinations may or may not be psychotic; nonpsychotic hallucinations are not uncommon. Five or more symptoms of postpartum depression must be present during the same two-week period to support a diagnosis, and he still did not believe defendant was suffering from postpartum depression. He observed there was no evidence defendant could not function in her day to day life, which is true of a person suffering from psychosis. Finally, he noted: "[T]he medical observers, the home observers, her own report, no one points to depression in this case. [¶] For [the prosecutor] to raise it, he's raising it, but there's no evidence of it."

*Prosecutor's Closing Argument*

In his closing argument, the prosecutor highlighted evidence he contended supported the finding that defendant suffered from postpartum psychosis. He argued that the jury should ignore the fact that defendant was not diagnosed with a postpartum mental disorder because postpartum mental disorders are underdiagnosed. Instead, he asserted that defendant experienced hallucinations, was overly stressed, was frustrated with Mirabelle's crying to the point the frustration turned to anger, had "depression issues" and "suicidal issues," and was introverted.

He pointed to the testimony about a Caucasian spirit or demon looking through the window, Mirabelle's rolling eyes, and defendant's priest coming to talk to her. For example, the prosecutor argued: "Is she concerned that there's [*sic*] demons possessing,

something in the eyes of Mirabelle?  Or is she concerned about herself or thought about killing herself because she had this seizure disorder, she's had those thoughts run through her mind and now her little baby girl is here?"  He added:  "Is she concerned about the demons and the cemetery that the house was built on?  Is she psychotic?  Is she just somebody hearing voices that told her to kill.  Does she have postpartum issues?"

In another instance, the prosecutor argued:  "Why are Mirabelle's eyes moving?  What is she watching?  The Caucasian guy outside the window or the spirit?"  He added:  "These eyes moving have nothing to do with something innocent like a baby just tracking a fly, because otherwise she would not keep connecting up with this:  [¶]  I'm scared.  We believe in God.  I go to a Mormon church."

The prosecutor pointed to defendant's statements to Chi and Choua:  "Her statement to her husband on [March] 18th:  [¶]  A Caucasian spirit/demon is outside the window watching.  A demon possessed her and that's why she did it.  [¶]  The statement to her mother:  [¶]  She said, We live on a cemetery.  We can't tell them the truth.  They will think we are crazy.  [¶]  There is evidence here."  He contended that defendant told Chi "the demons made her do it.  The spirits made her do it, and she's not referring to seizures as spirits.  She's saying demons made her do it.  That's what she tells her husband."  He argued:  "it is clear that she was having issues as it related to hearing those voices, issues that are related to demons.  [¶]  She got up from her computer, and she goes in, and she gets the demons out of her daughter."  He speculated that a voice in defendant's head told her to "[g]o put your child in the microwave."

In rebuttal, the prosecutor asserted:  "The defense doesn't want you to embrace that she had auditory hallucinations.  [¶]  It was just a little auditory hallucination.  Who cares."  He stated, "[u]nlike Dr. Resnick, who is just gonna say, I don't care about the psychiatric records where she talks about having hallucinations, you should consider that evidence."  Later he added:  "The defense wants to not embrace it.  Dr. Resnick wants to say it doesn't have anything to do with this case, but you know better, because . . .

something must be going on there.  [¶]  And it is.  It relates to the spirits, to the demons, to the fact that she's hearing these voices."

The prosecutor relied on the statistic that 41 percent of women with mental illness had thoughts of harming their child compared with seven percent of mothers in a control group, and in rebuttal he referred to studies showing that mothers with "psychiatric issues" are especially prone to have thoughts of "killing their child."  He then read entries from defendant's psychiatric file while commenting that the entries exhibited defendant's psychiatric issues and constituted factors related to postpartum depression.  He added that a crying baby can increase a mother's frustration.

*Jury Verdict and Sentence*

The jury found defendant guilty of first degree murder (Pen. Code, § 187; count one) and assault on a child, resulting in death (*id*., § 273ab; count two).  The jury found true the allegation that defendant personally used a deadly and dangerous weapon--a microwave oven--within the meaning of Penal Code section 12022, subdivision (b)(1), in connection with the murder charge.

The trial court denied defendant's motion for new trial and sentenced her to 25 years to life in prison on count one, plus one-year for the weapon-use enhancement.  The court imposed a sentence of 25 years to life on count two and stayed sentence pursuant to Penal Code section 654.  Defendant timely appealed.

**DISCUSSION**

I

*Expert Testimony of Postpartum Mental Disorders*

Defendant contends the trial court abused its discretion by permitting the prosecution to introduce the testimony of Dr. Vickers regarding postpartum mental disorders.  As relevant to our analysis, defendant argues the testimony was not supported by any evidence specific to defendant and her condition, and thus was irrelevant as devoid of any factual bases.  She adds that even if relevant, Dr. Vickers' testimony was

30

more prejudicial than probative due to its low probative value given the lack of diagnosis and its highly prejudicial nature as impermissible character and propensity evidence.

As we will explain, we agree the trial court abused its discretion by admitting the challenged testimony for these reasons, to which timely objections were lodged at trial, although we disagree with defendant's assertion that Dr. Vickers was not qualified to testify as she did. Because we find abuse of discretion on the grounds we have stated, we do not address defendant's additional claims of error regarding this testimony, which include that the testimony was improper evidence of diminished capacity; that evidence of postpartum depression is not proper "motive" evidence; that the risk factor evidence constituted a "criminal profile"; and that the testimony contained improper statistical evidence.[11]

A. *Procedural Background*

In a trial brief filed on August 28, 2015, the People indicated their intent to call Dr. Vickers regarding "the nature of post-partum depression and the pediatric concerns relating to it as it [*sic*] child abuse and neglect." The defense subsequently moved to exclude that testimony and any reference to postpartum depression, arguing it was without factual basis and no reports had been received. In their response thereto, the People argued the testimony was relevant to the issue of motive and that because Drs. Garcia and Treiman could not "rule out" a postpartum mental disorder as motivation for defendant's conduct in killing her baby, Dr. Vickers' testimony was "necessary."

The prosecutor proffered the symptoms of postpartum psychosis from a website as follows: confusion and disorientation, obsessive thoughts about the baby, hallucinations and delusions, sleep disturbances, paranoia, and attempts to harm oneself or the baby.

---

[11] Because we do not address these additional grounds, we need not and do not address the Attorney General's claim of forfeiture and defendant's related claim of ineffective assistance of counsel.

Applying those symptoms to the facts of this case, the prosecutor first proffered that defendant was confused about what had happened to Mirabelle. He recognized defendant blamed her confusion on a seizure, but contended this evidence was also consistent with disorientation related to postpartum psychosis. He next contended defendant "clearly suffered from obsessive thoughts about Mirabelle" because she had stated that Mirabelle was crying and could not be soothed before the killing. He argued that defendant was "clearly paranoid" the day of the killing, as she described a "spirit [that] was looking in on her and took her baby."

The prosecutor posited that defendant had experienced three hallucinations and delusions, relying on Chi's recollection of his conversation with defendant after the killing. He argued defendant's seeming agreement with the detective in an interview that she had considered self-harm in the recent past constituted evidence of attempts to harm herself, and her killing of Mirabelle was evidence of attempts to harm her children, thus there was evidence of attempted self-harm and attempted harm to her children that evidenced postpartum mental disorders. Finally, he contended that, "from a common sense point of view, most jurors are aware of post partum depression and a few commented on it in the questionnaire. The jurors will naturally want and appropriately need to know if there are factors that support post partum depression or psychosis."

At the first hearing on the motion, held on the first day of trial, August 31, 2015, the prosecutor argued the testimony would provide a "logical explanation" for defendant's act; the defense objected on relevance and prejudice grounds, and also to late discovery. The prosecutor clarified he disclosed the plan to call Dr. Vickers to defense the week before the hearing; the trial court reserved ruling. At a later hearing, defense counsel reiterated that the planned testimony was "a new thing" that she had only learned about two weeks before, and indicated she was not prepared to counter the testimony for that reason. She argued again there was no evidence defendant was suffering from postpartum depression, the planned testimony would be without foundation, and it would

encourage the jury to speculate. The prosecutor argued that postpartum depression was "an explanation" for the killing, and the issue had come up in juror questionnaires (which had already been disseminated and collected). He argued that because "everyone says this was unexpected," testimony about postpartum mental disorders would provide a "logical explanation." He posited, "the fact that there's no reason for her to do this makes the evidence more powerful." Defense counsel again responded that there was no basis in fact to admit the evidence and that it would only encourage speculation; she added that any probative value of the evidence would be substantially outweighed by the risk the jury would assume without a factual basis that defendant suffered from a postpartum mental disorder and would infer that she had a motive to kill. Defense counsel argued that this theory "has never been on the screen" and that the prosecutor "only recently spoke with Dr. Vickers," adding that "there's not been any ongoing belief that postpartum depression played a role at all." Instead, "the issue has always been whether or not [the killing] was the product of the seizure disorder." The defense also asserted the evidence would amount to inadmissible propensity evidence inviting the jury to speculate that there must be some evidence of a postpartum mental disorder given certain character traits and tendencies shared by defendant and those afflicted with postpartum disorders.

The prosecutor noted that (defense witness) Dr. Garcia "seems to also rely upon other background or social factors" and that the doctor had "candidly told [the lawyers] that if [defendant] doesn't have a CPS history and she doesn't have a criminal history and she's not a bad person" a seizure was more likely. Both lawyers noted that Drs. Garcia and Treiman had indicated when recently asked by the prosecutor that postpartum mental disorders were outside their area of expertise; defense counsel again stressed there was simply no evidence defendant suffered from such disorder. The trial court again deferred ruling.

The next day, the trial court ruled without hearing further argument that "the People are entitled to present reasonable evidence of possible motive" in the form of Dr. Vickers' testimony regarding postpartum mental disorders, as "[m]otive is a legitimate consideration." The court ultimately granted defense counsel a three-week continuance to prepare for this new evidence.

Dr. Vickers later testified for the prosecution as we have outlined in detail *ante*.

## B. *Dr. Vickers as an Expert Witness*

Defendant claims that Dr. Vickers lacked sufficient expertise to testify on the subject of postpartum mental disorders. An expert witness may testify "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)[12] " 'The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.] " 'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.' " ' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 140.)

We agree with the Attorney General that Dr. Vickers had sufficient training and experience to testify about the definitions of and differences between postpartum blues, depression, and psychosis, which are topics beyond the common experience of the jury. (See *People v. Davis* (2009) 46 Cal.4th 539, 605 [approving of expert testimony that the defendant's prior crimes, statements, and behavior were consistent with paraphilia, a sexual disorder]; *People v. Phillips* (1981) 122 Cal.App.3d 69, 82-84 [approving of expert testimony that the defendant's conduct was consistent with Munchausen syndrome by proxy].)

---

[12] Further undesignated statutory references are to the Evidence Code.

However, in both *Davis* and *Phillips*, the expert testimony related to the defendant's conduct and explained that the crime could have been motivated by the disorder or the syndrome that was the subject of the expert testimony. (See *People v. Davis*, *supra*, 46 Cal.4th at p. 605; *People v. Phillips*, *supra*, 122 Cal.App.3d at pp. 82-83.) As we will explain, and unlike the expert witnesses in *Davis* and *Phillips*, Dr. Vickers set forth no such coherent and relevant explanation for defendant's conduct. Indeed, she had no opinion about defendant's motivation for the murder; in her relevant contact with defendant, defendant showed no signs of postpartum mental disorders. Instead, Dr. Vickers was called upon to testify to a laundry list of background and character traits that were common to postpartum mental disorders. As we discuss *post*, although we agree that Dr. Vickers was qualified to testify as she did, her testimony itself was problematic.

C. *Relevance and Factual Basis*

Defendant claims that the evidence of postpartum mental disorders was irrelevant because the People failed to present sufficient evidence that defendant was either diagnosed with or exhibited any symptoms of a postpartum mental disorder. The Attorney General responds that the trial court properly admitted Dr. Vickers' testimony because there was evidence that defendant had symptoms of postpartum psychosis, which was relevant to prove her intent and motive. We agree that the testimony lacked sufficient factual basis, as we now explain.

Only relevant evidence is admissible at trial. (§ 350.) Under section 210, relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Evidence is relevant if it tends " ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Williams* (2008) 43 Cal.4th 584, 633.) "The trial court has considerable discretion in determining the relevance of evidence." (*Id.* at p. 634.) Even if evidence is relevant, section 352 provides that a "court in its

35

discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "The term 'prejudice,' within the meaning of . . . section 352, is not simply damage to the defense that naturally flows from relevant and highly probative evidence, but is instead an emotional reaction that inflames the jurors' emotions, motivating them to have a bias against, or to prejudge, an individual based on evidence that has only slight probative value on the issues. [Citations.] Under that statute, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome and renders the defendant's trial fundamentally unfair." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 702.)

It is often said that we review for abuse of discretion a trial court's ruling on the admissibility of evidence, including expert testimony. (See, e.g., *People v. Brown* (2016) 245 Cal.App.4th 140, 156.) However, we have explained before that "[t]he discretion conferred upon the court 'is a discretion, governed by legal rules, to do justice according to law or to the analogies of the law, as near as may be.' [Citation.] That is to say, the range of judicial discretion is determined by analogy to the rules contained in the general law and in the specific body or system of law in which the discretionary authority is granted." (*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771, 1778.) Accordingly, we consider "(1) whether the challenged evidence satisfied the 'relevancy' requirement set forth in . . . section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under . . . section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Scheid* (1997) 16 Cal.4th 1, 13.)

As we have described, here the prosecution sought to pursue through Dr. Vickers the theory that defendant was motivated to kill by her undiagnosed postpartum psychosis. That motive theory was the sole proffered relevance of Dr. Vickers' testimony, although she had actually screened defendant as negative for postpartum mental disorders after Mirabelle's birth. An expert's testimony must have some factual connection to the case in order to be relevant and helpful to the jury (§§ 350, 801, subd. (a)); accordingly, we first analyze whether there is factual support for Dr. Vickers' testimony.

The first of several factual bases proffered by the prosecutor was confusion about what had happened to Mirabelle, which the prosecutor claimed was the equivalent of disorientation related to postpartum psychosis. But there was no evidence that defendant presented as confused or disoriented immediately after the killing. As we have described in detail above, firefighters and law enforcement responding to the scene stated that defendant told them she had suffered a seizure, and none of these first responders found defendant to be confused or disoriented. They described her as alert and oriented. She consistently told them that she did not know what happened to the baby *because she had a seizure*. That is, she knew what happened--she had a seizure--but she did not know how the baby was hurt, because of the seizure. The fact that this evidence was subject to *challenge* in various ways does not in and of itself provide *evidence* that defendant was disoriented. The prosecutor pointed to no evidence suggesting defendant was confused or disoriented in the aftermath of the killing such that psychosis was suggested, and no such evidence was introduced at trial.

The second basis was "obsessive thoughts about Mirabelle" based on the assertion that defendant stated repeatedly that Mirabelle was crying more than usual on the day of the killing and could not be soothed. Although there is limited evidence of Mirabelle crying excessively (or "fussing") on the day she died, there was no evidence that defendant was excessively stressed, frustrated, or angry at Mirabelle for crying, and she consistently denied any such feelings. She was asked multiple times in multiple

37

interviews about the baby's excessive crying; the fact that she answered those questions, and in the process was required to reference the crying at length, does not evidence the "obsessive thoughts" proffered by the prosecutor, and there was no testimony opining that it did. Further, although testimony about colicky babies and their negative effect on their parents was elicited, there was no evidence that Mirabelle had colic as defined by the experts at trial; indeed, all relevant testimony indicated that she did *not* have colic.

The third basis was evidence of three hallucinations and delusions, relying on what defendant allegedly told Chi: (1) she believed a Caucasian man was peering in the window the day she killed Mirabelle; (2) she said "the man which she also describes as a spirit stated at some point 'I took your daughter; I'm happy I took your daughter, are you disappointed? Are you? Because you are not getting your daughter back' ";[13] and (3) she said Mirabelle's eyes were moving back and forth in an odd manner. The prosecutor added that Chi told investigators defendant had never spoken of a spirit or a Caucasian man looking in her home or taking her child prior to the killing.

As we have described in detail above, there was some limited evidence of hallucinations and delusions experienced by defendant around the time of the killing, advanced by Chi and others. However, much of this evidence was qualified and culturally associated, which lowered its probative value.

Portions of Chi's conversation with the prosecutor and his investigator, which took place three days before the 2015 trial, were introduced into evidence. Chi's conversation with the prosecutor and investigator involved Chi's recollection of private conversations between he and defendant in the days after the 2011 killing. The jury heard that Chi told the prosecutor that when he spoke with defendant at the police station, she said "there's

---

**13** This is direct quote from defendant's description to Chi of her dream, contained in the translated transcript that we discussed *ante*. She twice explains the conversation as part of a dream in the translated transcript.

38

[a] demon outside watching her," there was a good demon at the front of the house and a bad demon at the back of the house, and the demon made her kill Mirabelle.[14]  Chi said he spoke with defendant the following day, and she again said the demon "made me do this and that."  He explained, however, that she meant "[t]hat like she have a seizure . . . a demon took over her body and she did - that she - made - made she do what she did."  He clarified that she did not "remember the demon . . . making her do what she did."

At trial, Chi testified that defendant told him the "spirit and demon together" was looking at her through the window, was walking around outside of the house, and wanted the baby, but she did not tell him that the spirit made her do anything.  He testified that she told him that before her seizure, Mirabelle was moving her eyes back and forth looking at something, was crying, and was spitting out her pacifier.  He first asserted that she saw the apparition at a different time than when Mirabelle's eyes were moving, but then agreed it was around the same time.  Chi testified defendant had no history of talking about spirits or demons.

Chi recognized that some in Hmong culture believed that epilepsy is a manifestation of spiritual or demonic possession, although he does not hold those beliefs.  He clarified that defendant's discussion of spirits or demons was her attempt to piece together an explanation for what happened.  He agreed with the prosecutor that defendant told him at the police station, "[T]he spirit called me.  So I had a seizure."

Choua testified that defendant's discussions about spirits stemmed from what defendant's brother, Kao, told her.[15]  Defendant told Choua, "[i]f I tell them, they'll think

---

[14]  As we discussed *ante*, the translated transcript does not support Chi's characterization of defendant's statements.

[15]  This testimony is consistent with the translated transcript of defendant's March 18 conversation with Chi, in which defendant stated:  "I thought that Kob (or could be [defendant's brother] Kao) said the Caucasian guy outside keeps looking at me.  When I wasn't pregnant yet, he kept on looking at me."  She continued, "Kob [or Kao] said he has been watching me walking around from the bedroom and back.  That spirit is very

we're crazy because my brother -- that house, we don't know what it's built on. We don't know if it's built on a cemetery or something?" Defendant said that her brother said a ghost was watching her and the ghost was going to take the kids with her.[16]

Kao testified that defendant told him about a dream she had involving "spirits and stuff like that."[17] Defendant did not tell Kao that a spirit or demon made her do anything. After the incident, defendant told Va that she had seen spirits, but she did not specify whether she saw spirits before or after the killing, and she did not say that the spirits caused her to do anything; rather, she maintained she did not know what happened.

The prosecution also presented evidence of an interview defendant had with a CPS worker more than a month after the killing. Defendant again said she did not know what happened because she blacked out. Defendant said she saw a black shadow moving around the house, but she did not specify whether she saw the shadow before or after the seizure, or before or after she killed Mirabelle. The Attorney General contends it is reasonable to infer that defendant saw the shadow before she killed Mirabelle because she used "nearly identical phrasing" to describe the Caucasian spirit or demon to Chi. But both Chi and the CPS worker were testifying as to their recollection of defendant's

---

bad. Wherever I go, it goes and watches me from the window, said Kob. He/she said with my daughter, why did I have so many seizures with her? With my boys, I didn't have that many seizures."

[16] The Attorney General suggests that defendant was merely hearing a voice that she believed was her brother's, which told her a ghost was watching her and was going to take the kids and take her. There is no evidence of this.

[17] This testimony is consistent with the translated transcript of defendant's conversion with Chi, in which she discussed having a dream the morning of March 18 about a Caucasian man who "came and said to me 'I took your daughter; I'm happy that I took your daughter. Are you disappointed? Are you? Because you're not getting your daughter back.' "

statements, not her exact words.[18]  Additionally, the phrasing defendant was purported to have used in both instances was *not* "nearly identical"; the terms "shadow" and "spirit" or "demon" are not similar.  Further, as we have detailed above, Dr. Resnick testified an epilepsy patient can "see and hear things" "during an aura of an epileptic seizure."  The shadow evidence was weak evidence of a possible hallucination at an unknown time, at best.

Defendant's statements about Mirabelle's eyes moving back and forth is evidence of a possible visual hallucination that was proffered and later supported by the evidence at trial.  But while it is possible defendant hallucinated Mirabelle's eyes moving back and forth, Dr. Vickers testified an eight-week-old infant could track something around the room with her eyes, and she disagreed that perceiving an infant's eye movement was necessarily evidence of a hallucination.

There was certainly evidence at trial that, following Mirabelle's death, defendant discussed her experiences seeing, dreaming, and being told about spirits, demons, and shadows.  However, no expert witness testified that these experiences necessarily constituted psychotic hallucinations, and Dr. Resnick testified that the mere presence of hallucinations do not always render the sufferer psychotic.  There was no evidence that defendant was ever diagnosed with or treated for psychosis, despite testimony that such an illness would have been obvious to everyone around her, and despite Dr. Vickers' testimony that psychosis is not the kind of illness that would appear one day and disappear the next.  Indeed, in the hours and days after the killing, defendant interacted with numerous first responders and law enforcement personnel, some of whom interviewed her for hours on end, and none testified or otherwise indicated that defendant presented as profoundly mentally ill, suggesting psychosis.

---

[18]  The translated transcript of defendant's conversation with Chi does not reflect that defendant observed a spirit or demon "walk around the house."

Accordingly, when considering the evidentiary value of the evidence of hallucinations, we recognize both that there is evidence to support the finding that defendant experienced hallucinations, but also evidence suggesting that defendant held cultural, spiritual, or superstitious beliefs that a spirit or demon was causing her to have seizures. Chi, who provided the strongest testimony suggesting that defendant experienced hallucinations, explained in his conversation with the district attorney that defendant was trying to say that a demon took over her body and caused her to have a seizure, which made her do what she did. Chi also testified that defendant's statements to him were her attempt to piece together a justification for what happened. Thus, while we agree there was some evidence of hallucinations, we conclude the probative value of that evidence was substantially weakened by defendant's other statements and her family's testimony regarding her beliefs, expert testimony that 10 to 15 percent of people experience hallucinations and are not psychotic, and a conspicuous absence of other evidence of psychosis.

Fourth, the prosecutor acknowledged there was no evidence of sleep disturbances, but claimed defendant was "clearly paranoid that day" because she described a spirit looking in on her and took her baby. As we have discussed, this proffer of paranoia is not supported by the record and, even assuming the actions themselves were supported, the resulting assertion of paranoia is not. The only testimony regarding paranoia came from Dr. Resnick, who testified the baby's eye movement and the possibility of someone looking into the window did *not* constitute paranoia.

Fifth, the prosecutor offered his "most persuasive[ ]" evidence, that defendant thought about harming herself or her baby. He quoted extensively from defendant's interview with Merten, which we have discussed in detail *ante*. As we have described, although in that interview defendant admitted she had thoughts of harming herself due to her untreated seizure disorder, she did not say she had thoughts of harming the baby or her other children. There is simply no evidence of that. Instead, defendant expressly

42

denied any thoughts of harming her children; soon after Mirabelle's death, defendant stated she would *not* kill herself, specifically *for* the sake of her children. Additionally, while defendant acknowledged she thought of killing herself at some point due to her seizures, there is nothing to suggest these thoughts arose following Mirabelle's birth, much less that these thoughts arose as a symptom of postpartum psychosis.

The prosecutor attempted to bolster the evidence by arguing that defendant's act of killing her daughter suggests she suffered from undiagnosed postpartum psychosis, and her undiagnosed postpartum psychosis caused her to kill her daughter. The prosecutor asserted: "While [defendant] states it both ways in this portion of the conversation, it is clear that she has thought about killing herself in the past and has contemplated killing herself presently but has ruled it out for the sake of her children. We also know that she did kill Mirabelle. Therefore, this symptom would also be consistent with [postpartum] psychosis." That assertion attempts to connect and extend defendant's admitted thoughts of self-harm to thoughts of harming her children, which she consistently denied, by virtue of the fact that eventually defendant did indeed harm one of her children. This circular argument did not provide any factual support for Dr. Vickers' testimony.

Finally, the prosecution contended that "[t]he jurors will naturally want and appropriately need to know if there are factors that support post partum depression or psychosis." We do not see the relevance of prospective jurors' preconceptions about the role of postpartum mental disorders in Mirabelle's death in determining whether there is *evidence* that defendant suffered from a postpartum mental disorder such that a foundation for expert testimony was established.

The prosecution concluded by observing there is no single cause or symptom of postpartum depression and asserted evidence of postpartum depression is therefore supported. As we will discuss *post*, this argument foreshadowed Dr. Vickers' testimony, which invited the jury to find defendant suffered from an undiagnosed mental disorder based on the application of any number of risk factors and symptoms--such as

socioeconomic and immigration status--not constituting a competent basis for such a diagnosis. Viewed as a whole, the prosecution's purported evidence of undiagnosed postpartum psychosis was weak and speculative, based almost exclusively on the strained assertion that defendant's belief in spirits and use of such supernatural terms in reference to her seizures, her dreams, and her statements about what other people told her amounted to evidence of psychosis. The testimony was unsupported by sufficient factual bases.

D. *Propensity, Character, and Prejudice*

Defendant contends that Dr. Vickers' testimony, rather than tending to prove her motive to commit a crime, amounted to improper character and propensity evidence because it only tended to show that a mother with defendant's characteristics is more likely to develop a postpartum mental disorder, and a person suffering from a postpartum mental disorder is more likely to harm her baby. Section 1101, subdivision (a) provides that evidence of a person's character or a trait of her character, whether in the form of an opinion, evidence of reputation, or evidence of specific instances of her conduct, is *not* admissible when offered to prove her conduct on a specific occasion. "The statute is aimed at evidence of a person's 'propensity or disposition to engage in a certain type of conduct,' when 'offered as a basis for an inference that [s]he behaved in conformity with that character on a particular occasion.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1257 (*Gonzales*).)

The Attorney General responds that the prosecutor never intimated that defendant was guilty due to a mental condition that caused her to have a propensity to kill, but rather based his case on the evidence of defendant's mental state and her conduct at the time of the killing. Further, the Attorney General asserts that even if the evidence were character or propensity evidence, evidence that defendant suffered from a postpartum

mental disorder was admissible as "uncharged conduct" under section 1101, subdivision (b).[19]

In the absence of expertise regarding how to diagnose postpartum mental disorders and the absence of such a diagnosis for defendant, who had screened normal, Dr. Vickers provided a list of "risk factors" relevant to the development of postpartum depression. She explained it is unknown what causes postpartum depression or how many risk factors are required--although typically more than one--before a mother has postpartum depression. She further informed the jury that postpartum mental disorders are greatly underdiagnosed, meaning an absence of a diagnosis is not dispositive of (indeed, barely relevant to) whether defendant suffered from a postpartum mental disorder. The effect of this testimony was to inform the jury that defendant was at a higher risk of developing postpartum depression due to factors such as stress in her life, her socioeconomic status,[20] her introverted personality, her decision to not breastfeed, and her status as a member of an immigrant community. The testimony presented as a laundry list of background and character traits that were common to postpartum mental disorders, and suggested defendant was more likely to develop postpartum mental disorders due to various character traits, which impermissibly and prejudicially bolstered otherwise weak evidence of such disorders.

---

[19] That subdivision provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[20] There was evidence defendant and her husband had periodically been under financial stress, and there was evidence defendant was applying for public assistance benefits on the day she killed her daughter.

Dr. Vickers then testified that 41 percent of mothers with mental illness think about harming their babies, compared with seven percent of those not suffering from a mental illness. The prosecutor relied on this statistic in both closing and in rebuttal, when he referred to studies showing that mothers with "psychiatric issues" are especially prone to have thoughts of "killing their child." Although there was no evidence that Mirabelle had colic, Dr. Vickers also testified that 70 percent of mothers with colicky infants experience explicitly aggressive thoughts toward their infants, and 26 percent of them had infanticidal thoughts during the colicky episode.

Evidence of these risk factors, and the testimony that mothers satisfying some number of these risk factors are more likely to develop postpartum depression and psychosis, amounted to character evidence prohibited by section 1101, subdivision (a). The effect of the testimony was to invite the jury to apply these risk factors to defendant's character traits and find she was more likely to develop postpartum depression and psychosis, and consequently was more likely to kill her daughter. Without their application to defendant, these character traits--some highly personal, such as the decision to breastfeed, and some incontrovertible, such as immigrant status and introverted personality--were irrelevant.

In *Gonzales*, *supra*, 54 Cal.4th 1234 at page 1255, the defendant claimed the trial court erred by refusing to allow him to introduce evidence that his wife witnessed and experienced instances of child abuse for purposes of establishing third party liability for a child abuse charge. Our Supreme Court upheld the trial court's decision to exclude the evidence as inadmissible character evidence under section 1101. (*Gonzales*, at p. 1257.) The court recognized the purpose of the evidence was to invite the jury to infer that the wife, rather than the defendant, was responsible for the abuse due to a propensity the wife developed during her childhood, predisposing her to abuse her child. (*Ibid.*) Similarly, here, the risk factor evidence invited the jury to find defendant had a propensity to develop postpartum psychosis.

46

The Attorney General argues the evidence was not used to show defendant's propensity to commit a crime. He contends Dr. Vickers did not testify that women with postpartum disorders are more likely to commit crimes or testify defendant ever had postpartum depression, blues, or psychosis, and he denies that the prosecutor intimated defendant was guilty due to a mental condition. He further contends the instructions given to the jury appropriately instructed the jury to not consider bias based on disability, to assign weight to and disregard unbelievable, unreasonable, or unsupported expert testimony, and to consider whether defendant had a motive to kill.[21]

---

[21] The court instructed the jury with CALCRIM No. 200 in relevant part: "Do not let bias, sympathy, prejudice or public opinion influence your decision. Bias includes, but is not limited to, bias for or against the witnesses, attorneys or the defendant, based on disability, gender, nationality, national origin, race or ethnicity, religion, gender identity, sexual orientation, age or socioeconomic status."

The court also instructed the jury with CALCRIM No. 332 in relevant part: "Witnesses are allowed to testify as experts and to give opinions. . . . [¶] You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance or any opinion are for you to decide. [¶] In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion. [¶] You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] [¶] If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications."

The court further instructed the jury with CALCRIM No. 370 in relevant part: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

We disagree that these pattern instructions were sufficient to neutralize the error. Dr. Vickers testified that mothers with postpartum psychosis pose a "significant risk" of "severe injury and death" to their babies and presented statistics about the increase of explicitly aggressive thoughts in mentally ill mothers or those with colicky infants. While these statistics do not confirm that mentally ill mothers often harm their children--as opposed to often *think* about harming their children--the statistics generally support Dr. Vickers' testimony that children of mothers who are psychotic are at significant risk of injury or death. Additionally, although the jury was instructed not to let bias or prejudice affect its decision, the jury was also expressly told by Dr. Vickers that defendant's introverted personality, socioeconomic status, and ethnicity were *legitimate grounds* on which to find she was more likely to develop postpartum depression and psychosis, and thereby become a danger to her child. This made the jury much less likely to consider those factors as signaling bias or prejudice despite proper instruction with CALCRIM No. 200.

The Attorney General next argues that even if the testimony was inadmissible character evidence, it was admissible as evidence of "uncharged conduct" under section 1101, subdivision (b). The Attorney General does not explain, and we do not see how, the traits we have described constitute uncharged crime or other misconduct admissible under section 1101, subdivision (b). (See *Gonzales*, *supra*, 54 Cal.4th at p. 1258 [evidence that third party internalized abuse she experienced as a child not a specific act of misconduct; such evidence is "pure character evidence, well beyond the scope of [§ 1101, subd. (b)]"].)

After conveying to the jury that defendant was at higher risk of developing postpartum depression due to her character traits, Dr. Vickers then testified about the symptoms of postpartum depression, including such broadly-worded categories as difficulty sleeping, changes in appetite, anger, agitation, inability to concentrate, periods of crying with no explanation, and disruptions of daily life. But Dr. Vickers did not, and

48

could not, testify about how those symptoms would factor into a competent diagnosis of postpartum depression. Therefore, the jury was left with the understanding that defendant was at a higher risk of developing postpartum depression, and she could have suffered from postpartum depression if she, for example, had any trouble sleeping, had any change in her appetite,[22] or appeared agitated. No testimony informed the jury how to assess the severity of these symptoms or which combinations of the general symptoms were a sufficient basis on which to diagnose a mother of multiple young children with postpartum depression.

Dr. Vickers then testified that postpartum psychosis develops from untreated postpartum depression and that a history of postpartum mental health disorders is a risk factor for developing postpartum psychosis. Thus the jury was informed that defendant was at a higher risk of developing psychosis based on the general application of risk factors and symptoms of postpartum depression.

Dr. Vickers explained the symptoms of postpartum psychosis, including auditory hallucinations, visual hallucinations, disorientation, paranoia, thoughts of harming the child, not knowing who or where they are, rapid mood changes, irritability, psychomotor agitation, severe insomnia, and profound symptoms of mental illness. She testified that a person who is experiencing a psychotic episode has become detached from their circumstances or reality. Revisiting the prosecution's asserted factual connection of postpartum psychosis to the facts of this case demonstrates the marginal probative value of this testimony. Before trial, the prosecution asserted evidence of psychosis included obsessive thoughts about her baby crying and disorientation at the scene of the killing. Through Dr. Vickers' testimony, the jury was informed that defendant was at a higher

---

[22]  Dr. Resnick testified that a person must lose five percent of her body weight before a loss of appetite is considered significant. There is no evidence that defendant suffered clinically significant weight loss.

49

risk of developing postpartum psychosis due to character traits that might signal a tendency to develop postpartum depression, because the depression was likely to go untreated as it was likely to be undiagnosed. The jury was also told that defendant might have suffered from postpartum psychosis because her daughter was crying more than normal and because she informed first responders that she had a seizure and, consequently, could not remember and did not know what happened to her daughter. These are highly dubious factual connections that were supported only by Dr. Vickers' testimony.

The Attorney General contends Dr. Vickers' testimony was highly probative, and the facts upon which Dr. Vickers' testimony was based were not inflammatory, extraneous, or irrelevant because that evidence was derived from defendant's statements, including those about spirits and demons, ghosts, a fear of cemeteries, black shadows, and Mirabelle's rolling eyes. But absent a credible foundation for determining defendant suffered from a postpartum mental disorder, the jury was invited to find defendant was more likely to develop postpartum psychosis in part due to her ethnicity, introverted personality, and socioeconomic status. After making that foundational finding, the jury was more likely to accept the prosecutor's strained evidence of symptoms of postpartum psychosis.

The prosecutor's closing argument highlighted the purported evidence of psychosis. He asserted the jury should consider that postpartum mental disorders are underdiagnosed, implying an absence of a diagnosis was irrelevant to the determination that defendant suffered from such disorder. He highlighted defendant's admission of having had auditory hallucinations,[23] her thoughts of suicide, the Caucasian demon Chi had referenced, Mirabelle's eyes tracking around the room, and defendant's fear of

---

[23] We discuss the admissibility of psychological records relevant to defendant's auditory hallucinations, *post*.

50

demons and cemeteries.  The prosecutor also contended defendant's undiagnosed psychosis made her more likely to kill her daughter, relying on the statistics cited by Dr. Vickers.  Dr. Vickers' testimony provided a misleading foundation for this argument and bolstered otherwise weak evidence of any symptoms of postpartum mental disorders. The evidence was substantially more prejudicial than probative, due to its very limited foundation and its tendency to mislead the jury, and the trial court abused its discretion by permitting the challenged testimony.

We discuss the whether the error in admitting Dr. Vickers' testimony was harmless in Part III of our Discussion, *post*.

## II

### *Psychotherapist Records*

Defendant contends the prosecution was improperly granted access to her privileged psychological records from her time in county jail in violation of the statutory psychotherapist-patient privilege (§ 1014) and the constitutional right of privacy.  She further asserts the prosecutor improperly used confidential records inadvertently delivered to him to convince the trial court to release defendant's psychiatric file to the prosecution after the court had already ruled that the records were privileged.  The Attorney General responds that defendant waived the psychotherapist-patient privilege by tendering an unconsciousness defense, which he claims put her mental condition at issue under the patient-litigant exception to the privilege.  As we explain, we agree with defendant.

A.  *Procedural Background*

Both parties subpoenaed defendant's medical and psychological records, including her post-arrest records from the Sacramento County Jail.  During argument on motions in limine heard on October 6, 2015, during jury selection, defense counsel objected to the disclosure of any psychiatric records and invoked the "patient/psychotherapist privilege." The prosecutor argued that defendant had put her mental state at issue with her defense,

51

to which defense counsel responded that she was raising *medical* state rather than *mental* state, i.e. medical unconsciousness.  The court observed that defendant was "asserting a neurological rather than psychiatric problem"; defense counsel agreed with this observation.  The court took the matter under submission pending receipt and review of the records.

At an October 13 hearing, the trial court concluded that defendant's psychotherapist-patient privilege was still intact, but defendant's medical records related to her epilepsy were relevant and not privileged.  The court stated it continued to review the records it received, and it had not yet reviewed any records subject to the psychotherapist-patient privilege.  On October 15, the court affirmed that the People were entitled to defendant's medical records related to her epilepsy.  The court indicated it would continue to review records from the jail to identify if any records were arguably privileged, in which case it would entertain further argument from the parties as to the production of those records.  The court recognized its default would be to withhold from the prosecution anything that looked like it could conceivably implicate privilege.  On October 20, the court stated that it had divided the jail records into three categories: (1) records protected under the psychotherapist-patient privilege; (2) medical records referring to defendant's epilepsy that would be given to the prosecution; and (3) medical records unrelated to the issues at trial that would not be given to the prosecution.

After obtaining the continuance following the trial court's decision to allow Dr. Vickers' testimony, defendant secured the testimony of Dr. Resnick, whose testimony we have outlined in detail *ante*, to rebut the prosecution's theory, spearheaded by Dr. Vickers' testimony, that defendant was motivated to kill by hallucinations caused by an undiagnosed postpartum mental disorder.

At a midtrial hearing held on October 29, 2015 (Thursday), the parties discussed the proposed testimony by Dr. Resnick, anticipated to be presented out of order during the prosecution's case, due to a scheduling issue, on the following Monday (the next

52

court day). The prosecutor objected to Dr. Resnick's proffered testimony that no evidence suggested defendant had a motive to put her child in the microwave oven and that a seizure was the most likely explanation for Mirabelle's death. The court deferred the issue to Monday. There was no mention of privilege or request to revisit the court's ruling thereon at this hearing. The prosecutor filed his points and authorities the following Monday morning, seeking to limit defense expert testimony on the issue of motive and to limit expert testimony putting hearsay before the jury; again, there was no mention of access to documents previously ruled privileged.

The following Monday, November 2, the trial court ruled that Dr. Resnick could testify as to his categories of infanticide (which we explained *ante* when detailing the contents of his trial testimony), but he would not be permitted to offer an opinion as to which one applied to defendant or whether defendant was conscious at the time of Mirabelle's death. After the court ruled, the prosecutor indicated he had sent the court a request for defendant's psychological records. He then disclosed that he had already received and reviewed some psychological records, including a "psychological checklist, where [defendant] is talking about depression. She's got a depressive disorder. She has referenced potential thoughts of harming herself." The prosecutor argued if Dr. Resnick testified defendant had no suicidal thoughts, psychological issues, or depression, he was entitled to cross-examine Dr. Resnick with the relevant portions of defendant's psychological records that he (the prosecutor) had already reviewed.[24] The court indicated it was inclined to agree but would "hear the direct" before ruling. The court stated that it had disclosed only "medical, non-psych records, but you're saying there is

_____

[24] The prosecutor later clarified (on Wednesday, November 4) when defending the subsequent motion for mistrial that he had "discovered on the Sunday [November 1] in my preparation that there are a couple of pages that I had."

some psych.  I mean, I'm wondering if maybe some of the psych -- I'm wondering if those records got segregated in the way I intended."

Dr. Resnick then testified on direct examination as we have detailed *ante*.

During the morning recess, taken prior to Dr. Resnick's cross-examination, the prosecutor sought permission from the court to "go into psych records that I do have." He also requested the remainder of defendant's records, arguing that defendant had "put[] her mental state in issue."  He proffered to the court:  "In the psych records, [defendant] talks about auditory hallucinations. . . .  [T]here was adjustment disorder with depressed mood, depressive disorder nonspecific, moderate . . . .  She has auditory hallucinations . . .  [¶]  So at her entry into the jail, and a couple of times in the jail, it appears she had some auditory hallucinations."[25]

Over defense objection, the trial court allowed the prosecutor to go forward using "whatever materials he has in the medical stuff that apparently includes some psych relevant aspects, although my intention was to have pulled all that out. . . .  I think we failed in the endeavor."  The court also ordered disclosure of any remaining records referencing "psychiatric issues or psychological issues" not already inadvertently disclosed to the prosecutor, without detailing its reasoning in that regard, at the noon recess.

---

[25] This midmorning proffer seems inconsistent with the prosecutor's later claim when defending the motion for mistrial that he had discovered in the newly provided records "something very critical, the fact that [defendant] had auditory hallucinations" at the lunch recess that same day.  However, he did appear to later qualify that "the critical pages . . . where [defendant] had auditory hallucinations described on August 2nd, 2011, in the records, those were only discovered be me in the new packet" that he had received at the lunch break.  Either way, it is clear that records referencing auditory hallucinations were received and examined by the prosecutor before the court reversed its earlier ruling prohibiting disclosure of the psychological records to him.

The prosecutor then cross-examined Dr. Resnick with defendant's psychological records as we have detailed *ante*. The examination continued after the noon hour, by which time the prosecutor had been provided with the privileged records in their entirety.

B. *Affirmative Use of Documents Subject to Psychotherapist-Patient Privilege*

We begin with defendant's claim that the prosecutor excessively reviewed defendant's privileged psychological records inadvertently delivered to him by the court. In the context of waiving the attorney-client privilege under section 912, which also governs waiver of the psychotherapist-patient privilege under section 1014, the court in *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 at pages 656 to 657 summarized the ethical obligation of an attorney who receives privileged documents due to inadvertence: " 'When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified."

In *Rico v. Mitsubishi Motors Corporation* (2007) 42 Cal.4th 807 at page 817, our Supreme Court agreed the *State Fund* rule is a "fair and reasonable approach." The court extended the *State Fund* rule to documents protected by the work product privilege, and it observed the rule extends to "any other similar doctrine that would preclude discovery based on the confidential nature of the document." (*Id.* at p. 817, fn. 9.)

We recognize at the outset there is nothing to suggest the prosecutor intentionally obtained any privileged psychological record; however, it is clear that he reviewed those records he did receive. The first record referenced was entitled "psychological

55

checklist," which clearly signaled its privileged status, and the prosecutor recited in open court the diagnoses and symptoms reflected by the record. Upon realizing the privileged nature of the record, the prosecutor should have stopped reading and followed the procedure outlined by the cases referenced above.

As we have detailed *ante*, despite recognizing the prosecutor was not supposed to have the record at all, the trial court allowed the prosecutor to affirmatively use the record to cross-examine Dr. Resnick and also as a proffer to obtain disclosure of the remaining records previously classified as protected from disclosure by the privilege. As we discuss *post*, this was an abuse of the court's discretion.

C. *Psychotherapist-Patient Privilege and the Patient-Litigant Exception*

A patient "has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist." (§ 1014.) The privilege covers "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence . . . ." (§ 1012.) The prosecution bears the burden of establishing a statutory exception applies where undisputed facts at trial show the testimony involves confidential communications between a patient and a psychotherapist. (*People v. Gonzales* (2013) 56 Cal.4th 353, 372.) "[T]he psychotherapist-patient privilege is to be liberally construed in favor of the patient." (*Roberts v. Superior Court* (1973) 9 Cal.3d 330, 337 (*Roberts*).) "We have an 'obligation to construe narrowly any exception to the psychotherapist-patient privilege: we must apply such an exception only when the patient's case falls squarely within its ambit.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 554.) "The privilege is also considered 'paramount to prosecution,' generally outweighing the People's interest in successful prosecutions and their right to due process of law under article I, section 28, subdivision (d) of the California Constitution." (*Story v. Superior Court* (2003) 109 Cal.App.4th 1007, 1014.)

56

Under the patient-litigant exception to the psychotherapist-patient privilege, there is no privilege "as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by . . . [t]he patient." (§ 1016.) "There are two grounds for the patient-litigant exception. 'First, the courts have noted that the patient, in raising the issue of a *specific ailment or condition* in litigation, in effect dispenses with the confidentiality of that ailment and may no longer justifiably seek protection from the humiliation of its exposure. Second, the exception represents a judgment that, in all fairness, a patient should not be permitted to establish a claim while simultaneously foreclosing inquiry into relevant matters.' " (*Manela v. Superior Court* (2009) 177 Cal.App.4th 1139, 1148-1149, italics added (*Manela*); *Roberts*, *supra*, 9 Cal.3d at p. 337 [patient-litigant exception allows limited inquiry into the confidences of the psychotherapist-patient relationship, compelling disclosure of only those matters directly relevant to the nature of the specific "emotional or mental" condition the patient voluntarily disclosed and tendered].) " 'Disclosure cannot be compelled with respect to other aspects of the patient-litigant's personality even though they may, in some sense, be "relevant" to the substantive issues of litigation.' " (*Roberts*, at p. 338.)

In *In re Lifschutz* (1970) 2 Cal.3d 415, at pages 435 to 437, our Supreme Court elaborated on the parameters of the patient-litigant exception. The court recognized that where a party institutes an action seeking redress for a specific mental or emotional injury following an assault, such a limited waiver of the psychiatrist-patient privilege does not extend to psychological records tending to show the party seeking damages had previously "exhibited aggressive tendencies or had other personal attributes that might be related to the assault." (*Id.* at p. 435, fn. 21.) The court recognized, however, that in some cases a party puts their entire mental condition in issue, and all psychological records are relevant. (*Id.* at p. 435.) For example, a mental patient seeking a determination they are no longer " 'dangerous' " or " 'violent' " has put their mental

condition in issue. (*Id.* at pp. 435-436, citing *In re Cathey* (1961) 55 Cal.2d 679, 691, disapproved of on other grounds in *In re Barnett* (2003) 31 Cal.4th 466.) A criminal defendant who tenders a defense based on evidence of a mental disorder may thereby waive the privilege. (*People v. Ledesma* (2006) 39 Cal.4th 641, 659, 690 [diminished capacity]; *People v. Clark* (1993) 5 Cal.4th 950, 1005 ["rage reaction" defense]; *People v. Montiel* (1993) 5 Cal.4th 877, 923, disapproved of on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665 [impaired mental condition].)

A patient loses the protection of the psychotherapist-patient privilege only if they are first to "tender" the issue in litigation. In that regard, the court looks to see which party was first to raise the issue. (*Manela*, *supra*, 177 Cal.App.4th at pp. 1149-1150.) A party does not tender their mental condition simply by denying the opposing party's allegations regarding that condition. (*Id.* at p. 1149.) Pre-litigation statements made by a person to authorities do not "tender" an issue "in litigation" within the meaning of the patient-litigant exception. (*Karen P. v. Superior Court* (2011) 200 Cal.App.4th 908, 913.) Nor is there an "impeachment exception" to the psychotherapist-patient privilege. (See, e.g., *People v. Cannata* (2015) 233 Cal.App.4th 1113, 1123 [patient does not waive psychotherapist-patient privilege by testifying at trial where patient did not place his " 'mental or emotional condition' in issue at trial"].) We review a trial court's discovery order under an abuse of discretion standard. (*Story v. Superior Court*, *supra*, 109 Cal.App.4th at pp. 1013-1014.)

D. *Application of the Patient-Litigant Exception*

The parties agree, as do we, that defendant's jail psychiatric records were privileged under the psychotherapist-patient privilege. (§ 1014.) The parties dispute two issues: (1) whether defendant's assertion of the affirmative defense of unconsciousness due to epileptic seizure put defendant's *mental* condition at issue for purposes of waiving the psychotherapist-patient privilege, and (2) if so, whether the scope of such a waiver includes psychotherapist records regarding depression, auditory hallucinations, or other

58

evidence of postpartum mental disorders. We conclude that the scope of any such waiver did not extend to the records disputed here.

The Attorney General argues the prosecution was broadly entitled to rebut defendant's unconsciousness defense with evidence of her mental condition. But we must liberally construe the psychotherapist-patient privilege in defendant's favor and narrowly construe the patient-litigant exception to the privilege. (*Roberts*, *supra*, 9 Cal.3d at p. 337; *People v. Wharton*, *supra*, 53 Cal.3d at p. 554.) Accordingly, we construe defendant's unconsciousness defense as waiving her psychotherapist privilege only for records narrowly and directly related to the specific issue of her *consciousness*. Pursuant to that waiver and by way of hypothetical example, the People were entitled to any psychological record stating defendant remembered killing Mirabelle, defendant previously claimed unconsciousness, or defendant was diagnosed with some kind of pathological compulsion to assert unconsciousness whenever confronted with her misconduct. Such records would be directly related to the narrow issue of any mental (rather than medical) component of defendant's consciousness.

Here, the prosecutor, rather than defendant, tendered the issue of defendant's postpartum mental health; the People raised the issue and fought for admission of Dr. Vickers' testimony as well as defendant's psychological records as evidence of motive *distinct* from the question of defendant's consciousness. This alternative theory sought to affirmatively establish that defendant suffered from an undiagnosed postpartum mental disorder that motivated her to kill. The records the prosecutor used to cross-examine Dr. Resnick, concerning defendant's post-killing diagnosis of a depressive disorder, evidence of a reduced appetite after Mirabelle's birth, and evidence she experienced auditory hallucinations after Mirabelle's birth, were only indirectly relevant, if at all, to the issue of defendant's consciousness. Therefore, assuming for the sake of argument that unconsciousness related to epilepsy is to some extent a mental rather than a purely medical condition, those records did not fall within the scope of the tendered condition.

59

Because defendant did not waive her psychotherapist privilege with respect to her psychological records, the trial court abused its discretion by disclosing the records to the prosecution and allowing their utilization during cross-examination and for all purposes subsequent to the records' admission, including closing argument. As we have stated, there is no "impeachment exception" to the psychotherapist-patient privilege. (See, e.g., *People v. Cannata*, *supra*, 233 Cal.App.4th at p. 1123.) That rule follows from the commonsense proposition that a patient who has not put their mental condition in issue does not waive their psychotherapist-patient privilege by denying an opposing party's allegations. (*Manela*, *supra*, 177 Cal.App.4th at pp. 1149-1150.) Indeed, an impeachment exception to the psychotherapist-patient privilege would eviscerate the privilege by allowing a party seeking to prove an allegation against a privilege holder by putting the privilege holder's mental condition in issue and make allegations related to that condition. For example, here the prosecution put defendant's mental condition at issue by pursuing a motive theory that defendant suffered from postpartum psychosis. In such a situation, the holder of the privilege would be required to either not refute the allegation for fear of waiving the privilege, or refute the allegation and waive the privilege. We decline to adopt such a rule.

Even if Dr. Vickers' testimony had been properly admitted, that testimony was the first to tender defendant's mental condition. Until the time of Dr. Vickers' testimony, defendant had proffered only that she was unconscious due to an epileptic seizure. Although the prosecutor referenced the "social factors" referenced by Dr. Garcia's report in his initial (and unsuccessful) argument to deem the privilege waived, these were not mental state factors. Because the prosecution tendered defendant's mental condition, the psychological records remained privileged as previously ruled by the trial court unless the defense elicited testimony about the records; it did not. (§§ 912, 1014, 1016.)

As we have described, here the prosecution circumvented the psychotherapist-patient privilege by: (1) tendering defendant's mental condition; (2) inadvertently

obtaining and improperly reviewing and revealing privileged psychological records; (3) waiting for defendant to rebut testimony regarding the tendered mental condition; and (4) demanding access to the privileged records to impeach defendant's rebuttal witness. That is exactly the situation the privilege is intended to protect against. The patient-litigant exception applies where the patient-litigant herself tenders the mental condition, not where the patient-litigant is forced to rebut the tendering party's evidence regarding her mental condition. The patient is not required to disclose her psychological records in order to rebut the tendering party's assertion. The disclosure of defendant's privileged psychological records was error. We discuss the whether this error was harmless in Part III of our discussion, immediately *post*.

## III

### *Cumulative Error*

We requested and received supplemental briefing on the issue of cumulative error; specifically, we asked whether errors in the admission of Dr. Vickers' testimony combined with errors in permitting disclosure of the privileged materials resulted in prejudicial error when considered together. After careful consideration, we conclude that we must answer that question in the affirmative, as we now explain.[26]

---

[26] Defendant contends we should conduct our cumulative error analysis under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 because the improper breach of defendant's psychotherapist-patient privilege violated her federal constitutional right to privacy. As we will discuss, we conclude the cumulative effect of the violation of defendant's psychotherapist-patient privilege and the erroneous admission of Dr. Vickers' testimony constitute a miscarriage of justice, and therefore we do not address defendant's claim regarding the federal constitutional right to privacy. Further, the case defendant relies upon for the proposition that cumulative error may be reviewed under the *Chapman* standard of harmless error, *People v. Sturm* (2006) 37 Cal.4th 1218, 1244, does not stand for that proposition. Rather, *Sturm* only concluded that the cumulative effect of the trial judge's comments in that case required reversal under either the *Chapman* or *Watson* standard of review. (*Ibid.*)

A. *Applicable Law and Framing of the Issue*

A judgment shall not be reversed for the erroneous admission of evidence unless the result is a miscarriage of justice. (Cal. Const., art. VI, § 13; § 353, subd. (b); *People v. Hill* (1998) 17 Cal.4th 800, 844-845.) "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646; *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [series of trial errors, though independently harmless, " 'may in some circumstances rise by accretion to the level of reversible and prejudicial error' "]; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair"].) Additionally, multiple errors may create a "negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill*, *supra*, 17 Cal.4th at p. 847; see also *People v. Hernandez* (1977) 70 Cal.App.3d 271, 281 [combination of two errors prejudicial due to synergistic effect of the errors]; *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795; *People v. Holt* (1984) 37 Cal.3d 436, 449-456 [cumulative prejudice from multiple errors relating to defendant's credibility].)

Under this standard, which is expressed in substantially the same manner as the review for prejudice required by *People v. Watson* (1956) 46 Cal.2d 818, there is a reasonable probability of a more favorable result when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result." (*Id.* at p. 837.) Under *Watson*, our review " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may

62

consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)  The cumulative prejudice doctrine is based on an examination of the "entire record."  (*Delzell v. Day* (1950) 36 Cal.2d 349, 351.)

As we have discussed, the prosecution first tendered defendant's mental condition by informing the trial court and the defense of its intent to pursue a postpartum mental health theory through Dr. Vickers.  The court permitted Dr. Vickers' testimony as proffered, which, as we concluded *ante*, was error.  Defendant then sought and received a three week continuance (or perhaps more accurately a break in the trial, as jury selection had already begun), specifically to locate a witness to counter Dr. Vickers' testimony and the resulting implication that defendant was motivated to kill by a postpartum mental disorder.  There is no dispute that Dr. Resnick would not have been called to testify by the defense but for the need to counter the mental state evidence tendered by the prosecution as motive evidence.  At the conclusion of Dr. Resnick's direct examination, the prosecutor sought to cross examine him based on privileged information that the prosecutor had inadvertently received but purposefully reviewed; the prosecutor then sought and received further and complete disclosure of the privileged material based on a proffer that utilized the privileged records inadvertently disclosed.  The trial court then permitted the disclosure and use of the entirety of the records as evidence at trial; as we have concluded *ante*, this disclosure and use was error.

Faced with these multiple errors, we now address the issue of resulting prejudice.

B.  *Relative Strength of Defendant's Unconsciousness Defense*

Because the relevant law that we have outlined above requires us to assess the probable results of a trial that *excludes* the erroneously admitted evidence, we begin with a brief analysis of the strength of defendant's unconsciousness defense.  We acknowledge

that the jury rejected this defense, but we also consider that it did so after hearing the erroneously admitted evidence. The Attorney General contends that defendant presented insufficient evidence of unconsciousness such that it simply could not have provided her with a defense to the charges. We disagree.

As we have described at length *ante*, from the time of the killing and onward, defendant consistently asserted that she experienced a seizure just before the killing and did not remember the killing itself. Defense expert Dr. Garcia testified that defendant suffered from focal, complex partial, and generalized onset seizures and that postictal stages could last from as little as two minutes to up to 30 minutes. Dr. Garcia recognized that defendant's medical records included a prior normal EEG, and the fact that her medication did not suppress her seizures suggested she suffered from partial seizures. Dr. Garcia also observed that he was told by law enforcement that defendant reported biting one side of her tongue, which is consistent with complex partial--not generalized onset--seizures. Additionally, defendant's sister-in-law and brother, Kao, testified that defendant's seizures were not always the same, and that she would sometimes "just kind of blank out for several minutes," or experience a "fast seizure." Thus, there is substantial evidence that defendant did not only suffer from generalized onset seizures, but that she also suffered from complex partial seizures.

Dr. Garcia further testified that patients in a postictal state can place unusual items in unusual places, such as drawers, refrigerators, or toilets. He opined that defendant had sufficient time to have had a complex partial seizure, operate the microwave, and recover.

Dr. Treiman, the prosecution's expert, opined that defendant did not suffer from complex partial seizures because that condition was inconsistent with her history. However, even if defendant had experienced a generalized onset seizure, multiple witnesses to defendant's generalized onset seizures testified that defendant would sometimes attempt to get up right after having a seizure, but would be told to stay down.

64

This suggests that, in the absence of onlookers telling her otherwise, defendant attempted to get up and move around very quickly after having seizures in some instances.

The Attorney General contends that defendant's conduct was too complex to have been performed in a postictal state. He asserts that defendant was working on her computer until the moment she left for the kitchen, navigated with Mirabelle across the living room and to the microwave, opened it and placed Mirabelle inside, closed the door, and operated the microwave. She then waited for the microwave to stop running, removed Mirabelle, closed the door, and went to find her mother.[27] She then told Choua that they needed to take the baby to the hospital and later performed mouth-to-mouth breathing on Mirabelle.[28]

Dr. Treiman testified that ambulatory automatism in epileptics is uncommon, and it was unlikely that defendant's behavior could be completed by a person in a postictal state. But even Dr. Treiman initially expressed the opinion that defendant should not be prosecuted for murder because there was enough evidence that she acted while unconscious. Moreover, while Dr. Treiman opined at trial that the time between defendant's last act on her computer and the time she found her mother was insufficient

---

[27] The Attorney General contends that defendant removed Mirabelle's blanket before putting her in the microwave and then put the blanket back on her after taking her out. While the evidence shows that Mirabelle presented as swaddled both before and after she was killed, that does not support the assertion that defendant removed the blanket before putting her in the microwave and put it back on after the killing. The Attorney General also asserts that defendant consciously realized she could not seek help from Va because he was gone. That assertion reads too much into defendant's statements to law enforcement, which we have described *ante*, wherein defendant provided an after-the-fact justification for why she did not seek out Va. There is no evidence that defendant thought about Va *as she sought her mother*.

[28] The Attorney General also contends that defendant performed chest compressions, but after hearing the 911 call, Va testified that he performed the chest compressions. Additionally, defendant asserted that she performed these activities after she had regained consciousness, so we do not consider those activities as taking place during defendant's alleged period of unconsciousness.

for her to have had a seizure, perform the acts required to kill her daughter, and fully recover by the time Va returned home from picking up defendant's sons from school, his conclusion was based on his opinion that defendant only suffered from generalized onset seizures, an opinion with which Dr. Garcia disagreed.

We recognize that defendant's unconsciousness defense relies on a factual scenario the parties and expert witnesses agree is uncommon and even highly unlikely. However, there was substantial evidence from which a reasonable jury could have found that defendant killed her daughter while unconscious.

C. *Relative Strength of the Prosecutor's Case*

We next address the strength of the prosecutor's case for defendant's conscious killing of her baby as charged, without consideration of the erroneously admitted evidence.

The Attorney General contends that it is reasonably probable that the jury would have found that defendant "experienced something other than a seizure on the day she killed Mirabelle" even without the evidence at issue. But that is not our standard of review. Instead, we review for the reasonable probability that absent the errors the jury would have done something less than unanimously find defendant guilty as charged. (See *People v. Williams*, *supra*, 170 Cal.App.4th at p. 646 [we review each allegation and assess the cumulative effect of the errors to see " 'if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence' "].)

According to the Attorney General, "even in the absence of the evidence at issue, the prosecution would have theorized that appellant was conscious and did not suffer from a seizure. It would have argued that she did not have a seizure but suffered some sort of mental break that caused her to be highly anxious and paranoid, hallucinate a demon, and, in connection with her frustration with her daughter's incessant crying, resulted in the murder."

Certainly it was within the jury's prerogative to credit the testimony of Dr. Treiman over Dr. Garcia, despite the issues with that testimony as we have discussed, and conclude that defendant simply could not have done what she did while unconscious from suffering a seizure. And we do not disagree with the Attorney General when he asserts that: "[h]uman behavior, including extreme violence, can be unexplainable. Thus, based on the evidence, it would not be unreasonable for the jury to conclude that [defendant] did not experience a seizure and was, instead, conscious." Indeed, the jury could reasonably have concluded defendant was conscious.

But if the prosecution's counter to the unconsciousness claim were to be based on "some sort of mental break" as described by the Attorney General, the evidence supporting the theory would have been quite weak. We have discussed at length the absence of the evidence suggesting defendant was paranoid, frustrated, overwhelmed, and highly anxious, and the weakness of the evidence suggesting she was hallucinating spirits, shadows, or demons during the relevant time periods. That evidence becomes markedly weaker without Dr. Vickers' testimony providing context to connect the evidence to a possible mental condition, and the psychological records providing necessary credibility to otherwise weak and inconsistent evidence.

The Attorney General contends that, even in the absence of the inadmissible testimony, Dr. Vickers would have been permitted to testify as an expert in child abuse and neglect that crying from an inconsolable child can make a parent frustrated and possibly violent. He argues that Dr. Vickers would have testified that 70 percent of mothers with colicky infants experience explicit aggressive thoughts toward their infants, and 26 percent of those mothers have infanticidal thoughts during the colicky episode. We do not necessarily agree with that assertion. There was no evidence Mirabelle suffered from colic, which renders the evidence of aggressive tendencies of mothers of colicky babies irrelevant. Further, here there is little to no evidence that defendant was

67

frustrated with Mirabelle's crying, or even that Mirabelle was crying inconsolably or incessantly at any point during the relevant time period.

The Attorney General also asserts that Dr. Vickers would have been entitled to testify that one risk factor associated with infanticide is mental illness in general. But again, before introducing that testimony, the prosecutor would be required to demonstrate that defendant suffered from mental illness to establish its relevance. It is undisputed that defendant was never diagnosed with mental illness before the killing, and no witness, expert or otherwise, testified that she was mentally ill. The evidence of defendant's discussion of demons and spirits with her husband, about which the record is confused to say the least, her vague statement to the CPS worker about a shadow, and her statements to Kao, Va, and Choua were as likely to demonstrate defendant's spiritual or superstitious beliefs and her culturally-based tendency to attribute her epilepsy and resulting seizures to outside or supernatural forces as they were to demonstrate that defendant was suffering from mental illness.

The Attorney General further contends that it is reasonably likely the jury found defendant not credible after watching hours of her videotaped interviews with law enforcement, and that the jury could have concluded her statements to first responders and law enforcement evidenced a consciousness of guilt. Alternatively, the Attorney General posits that defendant might have put Mirabelle in the microwave to warm her up, pointing to testimony that defendant thought Mirabelle felt cold that day, and she thought warming the baby up would get her to stop crying.

Again, we do not disagree that there may be explanations for defendant's conduct other than postpartum psychosis or an epileptic seizure. But it is our task to assess the relative strength of the prosecution's case for a conscious killing of Mirabelle absent the erroneously admitted evidence. Here, that case is markedly weaker than when bolstered by the disputed evidence. However, in order to decide whether it appears reasonably likely the jury would have accepted the unconsciousness defense over these alternate

68

theories of culpability, we next look at any negative synergistic effect of the errors to assess the likelihood that the jury relied on the erroneously admitted evidence in reaching its decision.

D. *Negative Synergistic Effect of the Errors*

The prosecution introduced Dr. Vickers' testimony to prove its theory defendant was motivated to kill her daughter due to an undiagnosed postpartum mental disorder. As we have discussed, this testimony offered an alternative explanation for the killing, both to explain why an otherwise loving mother would commit such a heinous act, and indirectly to decrease the likelihood that defendant was unconscious when she killed Mirabelle. That evidence was erroneously admitted as the factual basis was deficient and the resulting testimony was far more prejudicial than probative, in part due to its reliance on defendant's character traits.

The factual basis of Dr. Vickers' testimony was substantially strengthened, however, when the trial court permitted the mid-trial introduction of the privileged psychological records after having previously excluded them. The psychological records provided essential, credible support for Dr. Vickers' testimony regarding postpartum mental disorders, and Dr. Vickers' testimony provided necessary context for the psychological records.[29] Thus, there is a strong negative synergistic effect in that the erroneous pretrial admission of Dr. Vickers' testimony regarding postpartum mental disorders combined with the erroneous mid-trial admission of the privileged records to support the prosecution's alternative motive theory of postpartum psychosis.

The prosecutor recognized the relationship between the postpartum mental disorder testimony and the psychological records evidence, reminding the jurors in

---

[29]  As just one example, Dr. Vickers testified that "hearing voices" is a symptom of postpartum psychosis that puts a baby at significant risk of injury or death, and the only indication that defendant had ever experienced auditory hallucinations came from the privileged records.

closing that 41 percent of depressed mothers think about harming their child. In rebuttal, the prosecutor referred to studies showing that mothers with "psychiatric issues" are especially prone to have thoughts of "killing their child," and he then read entries from defendant's psychological file while commenting, "[t]hat's a psychiatric issue," "[t]hat's a psychiatric issue," and "[s]ounds like one of those factors related to postpartum depression." These arguments expressly and prejudicially applied defendant's improperly admitted psychological records to Dr. Vickers' testimony about postpartum mental disorders.

Not only did the psychological records bridge an important gap in the prosecution's motive theory, they also bolstered the prosecution's weak evidence of psychosis. After the jury was informed (during the presentation of the prosecutor's case-in-chief) that defendant had admitted experiencing auditory hallucinations to her psychotherapist, her other statements regarding spirits, demons, cemeteries, and ghosts became more likely to reflect evidence of psychotic hallucinations rather than merely reflecting superstitions or spiritual beliefs. Similarly, evidence of loss of appetite and speculation about general irritability and frustration with crying took on elevated importance; the records provided the foothold that the prosecutor needed to argue the motive theory outlined by Dr. Vickers. The prosecutor took full advantage of that foothold, as we have described above, relying on the records to trumpet defendant's multiple "psychiatric issues" to the jury during argument and tie those "issues" to the statistics presented by Dr. Vickers showing likelihood of maternal violence.

Moreover, the manner by which the psychological records evidence was admitted focused the jury's attention on the evidence and amplified its importance. The introduction of the evidence in the middle of Dr. Resnick's testimony--after he testified that he saw no evidence defendant suffered from any psychiatric symptoms--suggested to the jury that Dr. Resnick was either ill-informed, unwilling to consider all of the evidence when forming his opinion, or both. In closing, the prosecutor recognized that Dr.

70

Resnick requested defendant's psychiatric records, but he did not receive the jail file. He also asserted that Dr. Resnick did not care about the psychiatric records, and he rhetorically wondered "[h]ow good is his opinion if he doesn't have all the evidence?"

The manner in which the evidence was introduced also had the effect of discrediting defense counsel by suggesting that she deliberately hid highly relevant records from Dr. Resnick and from the jury. The prosecutor highlighted this argument in closing as well, asserting that defense counsel "does not want you, the jury, Dr. Resnick or Dr. Vickers to consider that she may have had depression, psychosis, frustration, sleep and appetite issues." The prosecutor also used the psychological records to argue that defendant showed consciousness of guilt by lying to Dr. Resnick about her hallucinations so her epilepsy would be the only way to explain the killing. The effect of the unveiling of previously undisclosed evidence during Dr. Resnick's testimony and confronting him with it also occurred before the defense presented any other evidence, including that of its own expert on seizure disorders, Dr. Garcia. Dr. Resnick was made to look unprepared in a manner that potentially lessened any persuasive impact of his testimony and any testimony from defense witnesses who followed him.[30]

Accordingly, the introduction of the psychological records within the context of Dr. Vickers' testimony served to enhance the likelihood that defendant was psychotic while simultaneously discrediting defense counsel, defendant, and her defense. Thus, we conclude it is likely the jury relied on the evidence introduced as a result of the errors.

---

[30] At the hearing on defendant's motion for mistrial following Dr. Resnick's testimony, the trial court indicated that it "underst[ood] the concern" about "the jury wondering possibly about the timing of the records and why Dr. Resnick had not seen the records before" and "encourage[d]" the lawyers to prepare a stipulation resolving the concerns. It appears a stipulation was reached regarding certain dates and provided to the jury together with additional stipulations at the close of evidence, but neither party argues on appeal that the stipulation mitigated the prejudice in any way and after reviewing the stipulation we see no reason to believe that it did.

E. *Miscarriage of Justice and Deprivation of a Fair Trial*

As we have explained above, the defense of unconsciousness was supported and could have been accepted by the jury absent the errors we have described. Further, the prosecutor's remaining theories explaining the conscious killing of Mirabelle absent the errors were weak. The alternative theory that defendant suffered some other kind of psychotic break is substantially less persuasive than the postpartum disorder theory, as erroneously admitted. It is reasonably likely at least one member of the jury would have accepted the unconsciousness defense over the weaker psychotic break theory or any of the lesser theories suggested by the Attorney General, but for the errors and the cascade of resulting effects we have described. Finally, as we have just explained, there was a negative synergistic effect to the errors, making it highly likely that the jury relied on the errors in rejecting the defense of unconscious killing and embracing the theory of postpartum psychosis.

This case was centered on a killing that seemingly could be explained only in terms of implausible theories, such as postpartum psychosis, automatisms caused by epilepsy, a sudden psychotic break, or some other inexplicable and sudden change in behavior. Vastly and unfairly increasing the likelihood of one implausible theory made it inherently less likely that a different implausible theory best explained the killing. The evidentiary errors, taken together, fundamentally affected the outcome of the trial, and it is reasonably probable the jury would have reached a result more favorable to defendant in their absence. Based on the foregoing, we conclude that the evidentiary errors constituted cumulative prejudicial error, resulting in a miscarriage of justice and depriving defendant of a fair trial. This conclusion requires that we reverse the judgment.

## DISPOSITION

The judgment is reversed.

_____/s/_____
Duarte, Acting P. J.

We concur:

_____/s/_____
Hoch, J.

_____/s/_____
Renner, J.